In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3155

TEODOR TAMAS-MERCEA,

Petitioner,

v.

JANET RENO and the IMMIGRATION AND
NATURALIZATION SERVICE,

Respondents.


Petition for Review of an Order
of the Board of Immigration Appeals
A71 845 008


ARGUED MAY 16, 2000--DECIDED JULY 28, 2000



Before EASTERBROOK, RIPPLE and ROVNER, Circuit Judges.

RIPPLE, Circuit Judge.  Petitioner, Teodor Tamas-Mercea, seeks review of an adverse decision of the Board of Immigration Appeals ("BIA") denying his requests for asylum, withholding of deportation, and voluntary departure. For the reasons set forth in the following opinion, we dismiss Mr. Tamas' request for voluntary departure, deny the remainder of his petition for review, and affirm the decision of the Board of Immigration Appeals.

I
BACKGROUND
A.  Facts

Mr. Tamas/1 was born in Romania in 1952 and is a citizen of that country. His ancestry is predominantly Hungarian; his paternal grandmother was Jewish.

Mr. Tamas comes from a wealthy family in the Arad region of Romania. At one time, his family owned considerable land, several houses, and a mill. Several family members were also active in local politics. For example, Mr. Tamas' grandfather was both mayor of the city of Chisindia and leader of the National Peasant Party in that city. Mr. Tamas' father also held

the position of mayor in Chisindia.

After World War II, the communists collectivized land in Romania, an action which Mr. Tamas' grandparents and parents opposed. The secret police repeatedly visited the family home to force his grandparents to surrender the family properties to the Romanian government. When Mr. Tamas' grandfather, father and uncle resisted these efforts, they were arrested and beaten.

Mr. Tamas felt the effects of his family's resistance beyond the loss of their land and the suffering of his family members. His teachers withheld high marks and awards from Mr. Tamas because of his family history. When he attended a university, Mr. Tamas' Communist Party classmates received better grades and, eventually, better jobs than Mr. Tamas.

When Mr. Tamas married Rodica Mercea in 1981, his problems with the Romanian government continued. Rodica had a brother in the United States, and Mr. Tamas believes that this, combined with his family history, caused him to be the target of government surveillance. According to Mr. Tamas, "we were constant suspects to the Securitate. They harassed us continually and monitored my activities." R.271.

Tragedy of a different kind struck Mr. Tamas and his wife in 1984. In October 1984, Rodica gave birth to triplet sons; they were premature and therefore were sent to a hospital in a different city. Mr. Tamas visited his sons daily at the hospital for the next three weeks. One day, he arrived at the hospital and was told that the electricity had gone off in the middle of the night, that the generator had not kicked in, and that his sons had died. Mr. Tamas was instructed by hospital authorities to bring in three coffins. The hospital then returned locked coffins to him, and hospital authorities told him not to open the coffins. Mr. Tamas suspected that at least one coffin was empty.

Mr. Tamas quickly became frustrated with the treatment that he and his wife received from Romanian government employees following the death of their sons. For instance, Mr. Tamas had difficulty obtaining death certificates for his children, and Rodica was denied maternity leave because her children had not survived. Mr. Tamas was so angered by the difficulty with the death certificates and with his wife's maternity leave that he threatened the director of public health in his town.

When he tried to find out what happened to his children, his inquiries were met with evasiveness

and threats. Specifically, Mr. Tamas was told by the director of his company that if he did not mind his own business, he would lose his job. His wife, too, made inquiries and was told that she would lose her job if she pursued the subject further.

Shortly after the loss of the children, Rodica and one of her co-workers were involved in an accident with a construction vehicle. When Mr. Tamas went to the police station to obtain an accident certificate, the police allegedly would not speak to Mr. Tamas. Sometime later, the driver of the construction vehicle was admitted for the treatment of alcoholism to the hospital in which Rodica worked. The driver apparently told hospital staff that he would not be prosecuted for the incident because he was an informant for the secret police. Mr. Tamas believes that this man intended to kill his wife.

When the communist regime came to an end in Romania, Mr. Tamas attempted to regain his family's land. He was awarded ten hectares of farm land and one of forest; the remaining land and the mill were not returned. When he complained about the fact that the mill was not returned, he was told he would never get it back. When he and his father went to city hall to attempt to get the mill back, his father was beaten and, a few months later, suffered a fatal heart attack. At about this time, Mr. Tamas' car was broken into several times, and someone fired a gunshot through the window of his house.

Mr. Tamas and his wife left for the United States in 1991 and applied for political asylum shortly thereafter. Rodica returned to Romania in 1994 for her father's funeral; she was then unable to gain re-entry to the United States because her visa expired during her stay in Romania.

According to Mr. Tamas, Rodica has continued to be the target of government persecution. She has been advised that she will not be employed in the health care system. Also, when Mr. Tamas' summer home in Romania caught fire, "she was told [by the police] to relax if she doesn't want to burn herself or something." R.90. Finally, Mr. Tamas testified that, since his wife's return, she has been questioned concerning his whereabouts and that, when he receives letters from her, they have been opened.

B.  Administrative Proceedings
1.

The Immigration and Naturalization Service

("INS") commenced deportation proceedings in 1994 after Mr. Tamas' temporary visa expired. Mr. Tamas conceded deportability, but renewed his application for asylum. After several administrative delays, the Immigration Judge ("IJ") heard testimony on March 17, 1997. Before the IJ, Mr. Tamas argued that his ethnic and religious background, his family history, the death of his children, and the Romanian government's resistance to explaining his sons' deaths constituted persecution and, therefore, warranted a grant of asylum. Mr. Tamas also argued that he had a well-founded fear of future persecution because the individuals who had persecuted him in the past were still in power. At the conclusion of the proceedings, the IJ took the matter under advisement.

In a written opinion, the IJ analyzed each piece of evidence submitted by Mr. Tamas and concluded that Mr. Tamas had not suffered past persecution within the meaning of the asylum law. The IJ noted that, although the incidents of Mr. Tamas' childhood were unfortunate, he still received a professional education and had been gainfully employed; consequently, this discrimination did not rise to the level of persecution. The IJ reached a similar conclusion with respect to the harassment and surveillance Mr. Tamas endured because of his and his wife's family connections; these actions did not rise to the level of persecution for purposes of the asylum law.

The IJ also addressed the loss of Mr. Tamas' sons and the conflicts with various government offices that followed. The IJ stated:
While recognizing the tragic nature of losing one's children, particularly without knowing the reasons or circumstances, the court finds that this does not rise to the level of past persecution. It is simply not clear what happened to the children. . . .

Even if the children were taken [by the Romanian government], it does not appear that they were taken on account of the respondent's political opinion.

R.32-33. The IJ determined that "[t]he addition of the wife's accident also does not establish persecution[ ]" because, according to the IJ, Mr. Tamas had not come forward with evidence which suggested that the driver specifically had targeted Rodica, as opposed to simply causing an accident. R.33.

The IJ next addressed Mr. Tamas' argument that he feared future persecution. The IJ rejected this claim in part because the IJ questioned Mr. Tamas' testimony/2 and in part because

circumstances had changed so drastically since Mr. Tamas was last in Romania. Finally, the IJ denied Mr. Tamas voluntary departure because Mr. Tamas had stated during the hearing that he would not depart voluntarily if allowed to do so. Mr. Tamas appealed to the BIA.

2.

The BIA affirmed the IJ's decision and adopted much of his reasoning. First, the BIA agreed that Mr. Tamas suffered discrimination because of his family affiliation, but that this discrimination did not constitute persecution. Furthermore, the BIA concluded that Mr. Tamas' "theories about the death of his infant children and his wife's accident are too speculative a basis upon which to grant asylum." R.3. Finally, the BIA concurred with the IJ's assessment that conditions in Romania had changed to such an extent "that any fear [Mr. Tamas] might have had of returning to Romania should be significantly diminished." Id. Mr. Tamas timely appealed the BIA's denial of asylum.

II
DISCUSSION
A.  Statutory Standards

"Asylum eligibility 'is a factual determination which we review under the substantial evidence test.'" Petrovic v. INS, 198 F.3d 1034, 1037 (7th Cir. 2000) (quoting Sivaainkaran v. INS, 972 F.2d 161, 163 (7th Cir. 1992)). As a reviewing court, we are not entitled to reverse the BIA's determination "'simply because [we are] convinced that [we] would have decided the case differently.'" Anton v. INS, 50 F.3d 469, 472 (7th Cir. 1995) (quoting Milosevic v. INS, 18 F.3d 366, 371 (7th Cir. 1994)). "To win reversal under this deferential standard, [Mr. Tamas] must show not merely that record evidence supports a conclusion contrary to that reached by the BIA, but that the evidence compels that contrary conclusion." Bradvica v. INS, 128 F.3d 1009, 1011 (7th Cir. 1997) (citing INS v. Elias-Zacarias, 502 U.S. 478, 481 n.1 (1992)).

Congress has given the Attorney General discretion to grant asylum if an applicant qualifies as a refugee under 8 U.S.C. sec. 1101(a)(42)(A). See 8 U.S.C. sec. 1158(b)(1);/3 see also Kaczmarczyk v. INS, 933 F.2d 588, 593 (7th Cir. 1991). The Immigration and Nationality Act defines "refugee" as

any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the

protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group or political opinion, . . . .

8 U.S.C. sec. 1101(a)(42)(A).

Therefore, to prove that he is a "refugee" and eligible for asylum, Mr. Tamas initially must establish two elements under the statute. "First, [he] must demonstrate either actual past persecution or a well-founded fear of persecution in the future. Second, assuming that [he] can satisfy this first showing, petitioner[ ] must also show that the persecution [he] . . . endured is 'on account of' one of the five protected statutory grounds[:]" race, religion, nationality, membership in a particular social group or political opinion. Marquez v. INS, 105 F.3d 374, 378 (7th Cir. 1997).

If an alien establishes past persecution, there is a rebuttable presumption that he has a well-founded fear of future persecution and therefore should be granted asylum. See 9 C.F.R. sec. 208(b); see also Asani v. INS, 154 F.3d 719, 722 (7th Cir. 1998). The presumption is rebutted, however, if

a preponderance of the evidence establishes that since the time the persecution occurred conditions in the applicant's country of nationality . . . have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he or she were to return.

8 C.F.R. sec. 208(b); see also Asani, 154 F.3d at 722. We have recognized State Department reports as authoritative sources on the current political situations in foreign states and, therefore, helpful in determining whether an asylum applicant's fear of future persecution is well-founded. See, e.g, Petrovic, 198 F.3d at 1038 (approving BIA's notice of changed country conditions based on reports from the State Department)./4

Mr. Tamas bases his asylum claims on both past persecution and a fear of future persecution. We first address Mr. Tamas' arguments concerning past persecution.

B.  Past Persecution

Before the IJ and the BIA, Mr. Tamas argued that he should be granted asylum based on events that can be grouped loosely into three categories. The first category included punishments meted out

against him and his family because of his family's opposition to the communist regime. The second, related category included those events that occurred when Mr. Tamas attempted to recoup family lands after the fall of the communist regime. The third type of persecution Mr. Tamas alleged was the mysterious deaths of his sons and the Romanian government's reluctance to shed any light on their deaths. On appeal, Mr. Tamas consolidates these categories into the suffering of his family and the suffering he personally endured as a result of his sons' deaths. We turn first to his family's suffering.

1.

Mr. Tamas first argues that the BIA applied an incorrect legal standard in assessing his claim of persecution as it relates to suffering by his family members. Mr. Tamas reads the BIA's decision to state that family suffering can never provide a basis for a grant of asylum. See Appellant's Br. at 14. We do not read the BIA's decision so broadly. We read it only to state that, in the circumstances presented here, the suffering of Mr. Tamas' father, grandfather, and uncle, do not rise to the level of persecution of Mr. Tamas for purposes of the statute. We agree with the BIA's assessment.

The Immigration and Nationality Act does not define "persecution." However, this court has described persecution as "'punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate.'" Mitev v. INS, 67 F.3d 1325, 1330 (7th Cir. 1995) (quoting De Souza v. INS, 999 F.2d 1156, 1158 (7th Cir. 1993)). Persecution encompasses more than threats to life or freedom; non-life threatening violence and physical abuse also fall within this category. See Marquez, 105 F.3d at 379. However, actions must "rise above the level of mere 'harassment' to constitute persecution." Sofinet v. INS, 196 F.3d 742, 746 (7th Cir. 1999).

If Mr. Tamas personally had suffered the type of harm inflicted on his family members, we would have little trouble concluding that he had suffered persecution within the meaning of the statute. Mr. Tamas testified that his father, grandfather, and uncle were arrested and beaten for opposing collectivization. As well, his father was beaten in 1991, when he attempted to recover his family property. However, Mr. Tamas does not argue that he was subjected to this type of treatment./5 He, instead, claims a type of derivative persecution, that which arose from the physical abuse of his family members and the discrimination he personally endured because of his family's opposition to the communist regime.

We addressed the merits of similar derivative claims in Bereza v. INS, 115 F.3d 468 (7th Cir. 1997). In that case, Bereza sought asylum based on alleged persecution he had suffered as a result of his mother's opposition to the communist regime in Ukraine. Bereza's mother had served time as a political prisoner in a Soviet labor camp under Stalin during the 1940s. See id. at 470. Because of his mother's anti-Stalinist activities, Bereza suffered discrimination in schooling and at work; he was denied high grades, honors, higher educational options, and a good employment placement. See id. at 470-71. The BIA determined that the past persecution suffered by Bereza (including events not recounted above) was not sufficiently severe to merit a grant of asylum on humanitarian grounds. See id. In addition, noting that Soviet rule in Ukraine had come to an end, the BIA relied on the changed circumstances in Ukraine to hold that Bereza had not met his burden of establishing a well-founded fear of future persecution. See id. at 471-72. We affirmed the BIA's decision and concluded that, based on the type of discrimination alleged by Bereza and the evidence of changed conditions, the BIA's conclusion concerning both past and future persecution was supported by substantial evidence.

Here, as in Bereza, it was Mr. Tamas' family members who suffered persecution as a result of their political beliefs. Although Mr. Tamas did suffer some economic harm and personal humiliation as a result of his family's activities, the circumstances here are not sufficient to establish his persecution for purposes of the statute. See id. at 475-76.

Furthermore, we believe that the BIA's conclusion, that circumstances have changed sufficiently in Romania to rebut any presumption of future persecution based on the past suffering of Mr. Tamas' family members, finds support in the record. The State Department Country Profile submitted in this case militates against finding that any past persecution will continue. With respect to harassment by the Securitate, the State Department reported:

The Romanian Intelligence Service (SRI), heir to the justly hated Securitate of the Ceausescu era, operates under parliamentary oversight and has undergone repeated personnel restructuring. Unlike its predecessor the SRI does not have the power to arrest or detain suspects and has neither the priorities or resources for the sort of targeted harassment of individuals practiced in the past. It is holding the old Securitate files in its archives for 40 years, after which

they will be made public. Plausible allegations of surveillance or intimidation have become rare, and even these are linked to current concerns.

R.256. Furthermore, the State Department addressed Mr. Tamas' concern that, although the form of the Romanian government has changed, the same individuals are in positions of power. The Department stated:

[T]he vast majority of Romanian applicants contend that nothing has changed, that--as elsewhere in Eastern Europe--most of the leaders were once Communists and are capable and desirous of punishing those who opposed them in the past. In our view this essentially self-serving view does not comport with country conditions. The continued presence of leaders from the past reflects the lack of "untainted" people capable of governance and to a certain extent the inability of various opposition elements to coalesce.

R.255-56. The IJ and BIA adopted this view; we cannot say, under this deferential standard, that the evidence compels a contrary finding.

2.

Mr. Tamas maintains that the suffering he endured with respect to the death of his three sons, and the resistance by government authorities to providing him with answers concerning their deaths, constitutes persecution for purposes of the asylum statute. The Immigration Judge determined:

While recognizing the tragic nature of losing one's children, particularly without knowing the reasons or circumstances, the court finds that this does not rise to the level of past persecution. It is simply not clear what happened to the children. It is quite possible that they could have died as a result of the hospital's negligence, and the evasive acts of the administrators was an attempt to cover up their mistakes in order to avoid responsibility.

R.32. The BIA agreed that "[Mr. Tamas'] theories about the death of his infant children . . . are too speculative a basis upon which to grant asylum." R.3. We believe the record supports this conclusion.

Certainly having one's children forcibly taken, killed, or kidnapped might rise to the level of persecution. Cf. Singh v. INS, 94 F.3d 1353, 1361 (9th Cir. 1996) ("There is no question that persistent death threats and assaults on one's life, family, and business rise to the level of

persecution within the meaning of the Act."). However, as we set forth above, the asylum statute requires more than simply persecution; it requires persecution "'on account of' one of the five protected statutory grounds[:]" race, religion, nationality, social group membership or political opinion. Marquez, 105 F.3d at 378. The Supreme Court has made clear that the motive of those engaging in oppressive actions is a "critical" element of the Immigration and Nationality Act. Elias-Zacharias, 502 U.S. at 483. In order to prevail, therefore, Mr. Tamas must come forward with some evidence of motive, that the persecution was inflicted on one of the specified grounds.

The BIA concluded that Mr. Tamas had failed to come forward with evidence of motive; indeed, it concluded that his theories concerning his sons' deaths were speculative. Mr. Tamas does not point to specific evidence that compels us to conclude that the deaths or disappearance of his sons, and the events that followed, were the result of Mr. Tamas' race, religion, nationality, social group or political opinion. Indeed, in his arguments before the IJ, Mr. Tamas did not contend that his children were taken, or their deaths hastened, on account of his political beliefs or his family associations; he believed that his children were "spirited away." R.126. Consequently, the Board's conclusion is supported by substantial evidence./6

C.   Future Persecution

Mr. Tamas argues that if he returns to Romania he will face the same threats and persecution that he endured when he lived in Romania. He points to the questioning of his wife, the opening of his mail, the tapping of his phone calls, and the burning of his summer home as evidence that he will be targeted for persecution if he returns. The BIA concluded, as did the IJ, that "the record establishes that country conditions in Romania have changed to such an extent that any fear [Mr. Tamas] might have had of returning to Romania should be significantly diminished." R.3 (citations omitted). We cannot say that the record compels a contrary finding.

In order to be granted asylum on the basis of future persecution, Mr. Tamas must have a "well-founded" fear of persecution. "To establish a well-founded fear of persecution, an applicant must show both that he genuinely fears being persecuted and that his fear is objectively reasonable." Bereza, 115 F.3d at 472 (citations omitted). To qualify as "objectively reasonable," a reasonable person in Mr. Tamas' circumstances must fear persecution if he were returned to

Romania. See Balazoski v. INS, 932 F.2d 638, 640 (7th Cir. 1991).

Given these standards, we cannot find fault with the Board's conclusion that Mr. Tamas did not meet his burden of showing a well-founded fear of persecution. First, many of the actions identified by Mr. Tamas, such as the questioning of his wife and the opening of his mail, do not rise to the level of persecution under the statute. Consequently, they also cannot form the basis for a well-founded fear of future persecution. See Balazoski, 932 F.2d at 642 (holding that questioning and detention of family and searching family home were not sufficient to establish a well-founded fear of persecution); Zalega v. INS, 916 F.2d 1257, 1261 (7th Cir. 1990) (fear of questioning, denial of employment, and denial of travel rights do not constitute a well-founded fear of persecution).

Mr. Tamas also points to the burning of his summer home as evidence that he will be persecuted should he be returned to Romania. Mr. Tamas testified that "[t]he vacation house, the summer house we had, caught on fire. She [Rodica] called the police and she was told to relax if she doesn't want to burn herself or something." R.90./7 We cannot fault the BIA for not attributing great weight to this intrinsically ambiguous statement. Nothing in this statement suggests the fire intentionally was set or was allowed to continue unabated, much less that the Tamas family was the target of intentional action because of their race, religion, membership in a particular social group or political opinion. Without more, this statement is not sufficient to establish a well-founded fear of persecution on one of the statutory grounds; therefore, we shall not reverse the BIA's decision based on this evidence.

Furthermore, as with the evidence concerning his family, we believe that the State Department Country Profile undermines Mr. Tamas' argument that he has a well-founded fear of future persecution in Romania. As set forth above, the Profile concludes that the Romanian Intelligence Service does not have the inclination or resources to pursue the same type of individualized surveillance and persecution as the Securitate. See R.256.

There is no doubt that Mr. Tamas has suffered while living in Romania. Romania's recent history, including the horrors of the Ceausescu regime, the turmoil following his execution, and the growing pains of a new democracy, have made life in that country difficult. However, "generalized conditions of strife" do not "show

that [Tamas] himself will be singled out for persecution on account of one of the enumerated grounds," Bradvica, 128 F.3d at 1013, and the judiciary cannot "stretch the definition of 'refugee' to cover sympathetic, yet statutorily ineligible, asylum applicants," Sivaainkaran, 972 F.2d at 165. The events surrounding Mr. Tamas' life in Romania do not compel a finding that he suffered past persecution or will suffer future persecution on one of the grounds enumerated in the statute. We, therefore, uphold the BIA's determination.

## D.   Lack of Due Process

Mr. Tamas makes one final argument in support of his asylum application. He claims that he first applied for asylum in 1991, and, had his asylum application been processed in an expeditious manner, he likely would have been granted asylum. Mr. Tamas relies upon Batanic v. INS, 12 F.3d 662 (7th Cir. 1993), in support of his argument. We find Batanic inapposite.

In Batanic, the petitioner was found deportable at a hearing in which he was denied the right to counsel. See id. at 664. The BIA reversed the IJ's finding of deportability on that ground and Batanic was provided a new hearing. See id. However, in the interim, Congress had passed a law that rendered Batanic, who had been convicted of an aggravated felony, ineligible for asylum. See id. Relying on the statute, the IJ denied Batanic's asylum application and the BIA affirmed. See id. On appeal, we held that, in most cases, a procedural defect is cured by allowing a new hearing in which the defect is not present. See id. However, "when the procedural defect has also resulted in the loss of an opportunity for statutory relief, these remedies cannot cure the defect." Id. at 667. Consequently, we reversed the BIA's decision and allowed Batanic to apply for asylum nunc pro tunc to the time of his initial hearing. See id. at 668.

In this case, there was no evidence that a procedural defect worked to deprive Mr. Tamas of a specific statutory right. Mr. Tamas only speculates that he would have been granted asylum had his application been processed through the system in a shorter period of time. Batanic, by contrast, was absolutely barred from seeking asylum because of the intervening congressional action. Consequently, we conclude that Mr. Tamas has not stated a due process violation similar to that in Batanic.

## E.   Denial of Voluntary Departure

Mr. Tamas also requests that this court reverse the BIA and grant him voluntary departure. Both Mr. Tamas and the INS agree that Mr. Tamas' petition falls within the transitional rules for judicial review of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), P.L. 104-208, 110 Stat. 3009-625 (1996). According to IIRIRA sec. 309(c)(4)(E), there shall be no judicial review of discretionary decisions, including decisions by the BIA to grant or deny voluntary departure. See id. Consequently, this court does not have jurisdiction to consider Mr. Tamas' request.

Conclusion

For the foregoing reasons, the request for voluntary departure is dismissed, the remainder of the petition for review is denied, and the decision of the Board of Immigration Appeals is affirmed.

DISMISSED IN PART; AFFIRMED IN PART

/1 The petitioner stated during his asylum hearing that he preferred to be addressed as Mr. Tamas.

/2 The IJ stated as follows: "He [Mr. Tamas] also alleges that [his wife] has been routinely questioned by police. Although the respondent stated that he receives opened mail from his wife informing [him] of these things, he did not submit such letters to the court. The respondent provided no explanation for the absence of these seemingly available corroborative letters . . . ." R.34.

/3 8 U.S.C. sec. 1158(b)(1) states: "The Attorney General may grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Attorney General under this section if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title."

/4 Even if there is little likelihood of future persecution, we have recognized the power of the Attorney General to grant asylum "as a matter of discretion for humanitarian reasons if the alien has suffered an 'atrocious form[ ] of persecution'. . . ." Asani, 154 F.3d at 722 (quoting Matter of Chen, Int. Dec. 3104, at * 16 (BIA 1989)). Mr. Tamas, however, does not argue that he suffered "atrocious" forms of persecution that might warrant a grant of asylum on humanitarian grounds. Consequently, we limit our

discussion to the statutory framework outlined above.

/5 In Mr. Tamas' affidavit attached to his second asylum application, he claimed that he, as well as his father, was beaten by government employees when they visited city hall to attempt to recoup additional family lands. See R.273. In his testimony before the IJ, Mr. Tamas stated only that his father was beaten; he characterized his harm as only "psychological." R.87. In his brief to this court, Mr. Tamas recounts this second version of events as opposed to the version contained in his affidavit. Accordingly, we use his testimonial account in rendering our decision.

/6 The same is true with respect to Mr. Tamas' belief that his wife's car accident was an intentional act intended to stop his inquiries concerning his sons, as opposed to simply the acts of an irresponsible driver.

/7 Mr. Tamas does not mention this incident in the affidavit attached to either his first or second asylum applications.