# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 02-2213

DANIELA M. CIORBA,

*Petitioner,*

*v.*

JOHN D. ASHCROFT,[1]

*Respondent.*

Petition for Review of an Order
of the Board of Immigration Appeals
A 75 256 249

ARGUED JANUARY 14, 2003—DECIDED MARCH 21, 2003

---

[1] The petition for review correctly identified the Immigration and Naturalization Service ("INS"), as well as the Attorney General, as respondents in this case. On March 1, 2003, the INS ceased to exist as an independent agency within the Department of Justice and its functions were transferred to the newly formed Department of Homeland Security. This petition for review challenges the decisions of the Executive Office for Immigration Review (Board of Immigration Appeals and immigration court), which is a component of the United States Department of Justice. Attorney General John D. Ashcroft is the head of the Department of Justice. The Attorney General, therefore, has been listed in the caption as the sole respondent. *See* 8 U.S.C. § 1252(b)(3) (2000) (respondent is the Attorney General where immigration court proceeding commenced after April 1, 1997).

Before EASTERBROOK, RIPPLE and ROVNER, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Petitioner Daniela M. Ciorba seeks review of an adverse decision of the Board of Immigration Appeals (the "BIA" or "Board") that denied her request for asylum. For the reasons set forth in the following opinion, we affirm the decision of the BIA and dismiss the petition.

# I
# BACKGROUND

## A. Facts

Ms. Ciorba is a twenty-eight-year-old native of Romania. According to her application for asylum, several generations of her family actively resisted the Communist regime and the dictatorship of Ceausescu. Both of Ms. Ciorba's grandfathers were jailed for their opposition to collectivization and were physically debilitated as a result of the abuse and the lack of medical attention they endured while incarcerated. *See* A.R. 136. Ms. Ciorba further claims that her "grandparents' stigma of enemies of the communist regime has reflected upon [her] parents and [herself] as well," and, consequently, her parents were under the close watch of the communist authorities. *Id.* at 136. They were called in for questioning, and the entire family was barred from higher education. *See id.* at 136-37.

Ms. Ciorba testified that, although neither she, her husband, nor her parents were involved in any organized groups opposing the Communist regime, her father apparently participated (and perhaps helped organize) one

rally during which Ceausescu's picture was burned.[2] After that time, police came to the family home several times to question her father. It appears from the record that he may have been taken for questioning; however, he never was beaten or jailed. Ms. Ciorba testified that her father also lost his job as a result of his participation in this demonstration.

In 1990, when Ms. Ciorba was sixteen, her father left Romania "[b]ecause he couldn't rest at night." *Id.* at 76. Ms. Ciorba stated that "[t]hey would come, people he wouldn't know from the (indiscernible) or the police station and

---

[2] There appears to be a discrepancy with respect to these facts within Ms. Ciorba's asylum application and also between that application and her testimony at the removal hearing. In the affidavit attached to her asylum application, Ms. Ciorba stated that "[m]y husband, whom I married in 1990, was arrested in February 1990 for no particular reason, except that he was an active member of the Liberal Party . . . ." A.R. 137. But later in the asylum application, Ms. Ciorba responded "No" to the following question: "Have you or any member of your family ever belonged to or been associated with any organizations or groups in your home country (i.e., a political party, student group, union, religious organization, military or paramilitary group, civil patrol, guerilla organization, ethnic group, human rights group, or the press)?" *Id.* at 141.

Furthermore, during her testimony at the removal hearing, the IJ specifically directed Ms. Ciorba to this question on the application and again asked if any of her family members had belonged to a political party or group. In response, Ms. Ciorba made no mention of her husband's involvement in a political party; Ms. Ciorba stated only that her father was part of a "revolutionary group in 1989" and that he "participated in a meeting" in which a picture of Ceausescu was burned. *Id.* at 62-63.

start to question him." *Id.* Ms. Ciorba's mother and hus-
band followed her father in 1991.[3] She remained in Roma-
nia.

From 1991 until 1996, Ms. Ciorba lived in her family's
home in Romania. On a monthly basis, the police would
summon her to the station where she would be ques-
tioned for lengths of time ranging from one-half hour to
three hours. She never was arrested, jailed, threatened
or abused in any way. During these sessions, the police
inquired as to why her family had left Romania and as
to the status of their asylum applications. The local police
also came to search her home; however, the record does
not reveal how many times these searches occurred. Dur-
ing some of these searches, the police took gold and
other items that Ms. Ciorba had received from her family
in the United States.[4]

In 1996, Ms. Ciorba came to the United States to join her
family; she arrived in January of that year without being
admitted or paroled.

---

[3] Some time before their departure to the United States, Ms.
Ciorba's husband and mother lost their jobs as well. According
to Ms. Ciorba, this occurred after her father had left for the
United States and applied for asylum. The record does not
reveal the circumstances surrounding the termination of their
employment or what their employment prospects were after
they lost their jobs.

[4] The police, however, apparently did not take money that
Ms. Ciorba's husband and parents had sent to her from the
United States.

**B. Administrative Proceedings**

**1.**

The INS instituted removal proceedings against Ms. Ciorba in May 1997. At the beginning of her removal hearing, the IJ stated: "You do have the right to present your case before the Court. I have explained that to the lawyers. That's why I'm here and I'm willing to listen to you. I have not made a decision in your case. I'm merely advising the lawyers based upon what I see in the documentary evidence. And based upon what I see it appears to be frivolous." A.R. 56.

Later in the hearing, Ms. Ciorba's attorney inquired whether any of Ms. Ciorba's relatives had suffered any hardship or mistreatment at the hands of the Romanian government. Before Ms. Ciorba could respond fully, the IJ stated: "I want to know what, I want to know and I want to concentrate between 1991 and 1996 only. Everything else is too remote to be considered." A.R. 73. Ms. Ciorba's attorney then indicated that there were events involving Ms. Ciorba's family—specifically concerning Ms. Ciorba's father—that occurred prior to 1991 that, he believed, were important to Ms. Ciorba's asylum application. The IJ and Ms. Ciorba's attorney then questioned Ms. Ciorba about what had happened to her father and why he had left Romania. *See id.* at 73-77. With the exception of the events involving her father, Ms. Ciorba's attorney never made an offer of proof regarding any other events that occurred prior to 1991 that impacted Ms. Ciorba's asylum application.

Near the end of Ms. Ciorba's testimony, the IJ asked why Ms. Ciorba was afraid to return to Romania. Ms. Ciorba replied, "I'm afraid I would be again questioned just like I was before." *Id.* at 88. When pressed for additional reasons by the IJ, Ms. Ciorba stated, "[b]ecause they would

ask me again why I left, why I came here. They would question me again." *Id.* Finally, Ms. Ciorba stated that she feared that she would have to go to the police station again and that the police would search her house again. *Id.*[5]

After receiving the evidence and hearing the arguments, the IJ concluded that Ms. Ciorba had not met the requirements for a grant of asylum. The IJ found that, although Ms. Ciorba had suffered some harassment at the hands of local Romanian authorities, that harassment did not rise to the level of persecution; specifically, the IJ noted that "the respondent did not testify that on any one of these occasions was she ever threatened, either sexually threatened or physically threatened by anyone." *Id.* at 37. Furthermore, the IJ found that there was no nexus between the harassment and any ground for asylum enumerated in the statute. Consequently, the IJ denied Ms. Ciorba's request for asylum.

**2.**

The BIA summarily affirmed the IJ's decision. It stated: "The Board affirms, without opinion, the results of the decision below. The decision below is, therefore, the final agency determination. *See* 8 C.F.R. § 3.1(a)(7)." A.R. 2.

Ms. Ciorba filed a timely petition for review in this court.

---

[5] During closing statements to the IJ, Ms. Ciorba's counsel acknowledged that "mistreatment . . . by the local police obviously does not amount to past persecution within the meaning of the Act." *Id.* at 97-98. According to Ms. Ciorba's counsel, "the only issue was whether the politically motivated harm or mistreatment of family members, specifically the father, have [sic] a bearing on respondent's fear of persecution." *Id.* at 98.

## II

## ANALYSIS

### A. Standard of Review

We review the BIA's asylum determination under the substantial evidence test. *See Petrovic v. INS*, 198 F.3d 1034, 1037 (7th Cir. 2000). We shall disturb the BIA's findings "only if the record lacks substantial evidence to support its factual conclusions." *Malek v. INS*, 198 F.3d 1016, 1021 (7th Cir. 2000). "To win a reversal under this deferential standard, [Ms. Ciorba] must show not merely that the record supports a course contrary to that reached by the BIA, but that the evidence compels that contrary conclusion." *Bradvica v. INS*, 128 F.3d 1009, 1012 (7th Cir. 1997). We review the BIA's legal analysis de novo. *See Marquez v. INS*, 105 F.3d 374, 378 (7th Cir. 1997).

### B. Deprivation of Due Process

Ms. Ciorba maintains that the IJ denied her a fair hearing in two ways. She first claims that the IJ prejudged her application as evidenced by the IJ's introductory comments at the removal hearing. We cannot accept that characterization of the IJ's comments. Those comments simply advised the parties and counsel as to the IJ's initial assessment of the documentary submissions and were no doubt designed to focus counsel's attention on the importance of the evidentiary submissions to be made during the ensuing hearing. Indeed, at the time she gave this preliminary assessment, the IJ explicitly stated that she had not made a decision in Ms. Ciorba's case and would consider the evidence presented during the hearing. *See* A.R. 56. Therefore, these comments, without more, do not establish bias on the part of the IJ.

Ms. Ciorba also submits that, when the IJ limited testimony to events that occurred between 1991 and 1996, Ms. Ciorba was prevented from "laying a foundation for her fear of persecution through a showing that her father and grandparents had been persecuted and their political opinions imputed to her . . . ." Petitioner's Br. at 13. This argument is unpersuasive for several reasons. First, the IJ did allow Ms. Ciorba to develop a record of pertinent events that occurred prior to 1991. When Ms. Ciorba's attorney pointed out that Ms. Ciorba's claim for asylum was tied to events that occurred prior to 1991 involving Ms. Ciorba's father, the IJ questioned Ms. Ciorba regarding why her father had left Romania. Ms. Ciorba's attorney then followed-up on that questioning in some detail. *See* A.R. 73-78. Second, not only did Ms. Ciorba fail to make an offer of proof to the IJ concerning other pre-1991 events that impacted her asylum application, she also has failed to explain to this court what that additional testimony would have been or how it would have affected the asylum determination. We have made clear that "a petitioner must show that an immigration judge's refusal to entertain the testimony of his witnesses prejudiced him, i.e. that the testimony he sought to introduce had the potential for affecting the outcome of . . . deportation proceedings." *Podio v. INS*, 153 F.3d 506, 511 (7th Cir. 1998) (internal quotation marks and citations omitted). Ms. Ciorba has not made this showing. Finally, assuming Ms. Ciorba's testimony would have focused on the mistreatment of her extended family referenced in her asylum application, we do not believe that this testimony would have assisted Ms. Ciorba in establishing her eligibility for asylum. Ms. Ciorba cannot rely solely on the persecution of her family members to qualify for asylum, *see Tamas-Mercea v. Reno*, 222 F.3d 417, 424 (7th Cir. 2000) (rejecting the concept of "derivative persecution"); she must show

that her family's political opinions have been imputed to her and that she has suffered or will suffer persecution as a result, *see id.* As we shall discuss in greater detail below, Ms. Ciorba's evidence fell short of meeting this standard.

## C. Fear of Future Persecution

To establish that she is a "refugee" as defined in 8 U.S.C. § 1001(a)(42), and therefore eligible for asylum, Ms. Ciorba must meet two requirements. First, she must come forward with evidence either of past persecution or of a well-founded fear of future persecution. *See Tamas-Mercea*, 222 F.3d at 423.[6] Second, she also must show that the persecution she endured (or is likely to endure in the future) was on account of her race, religion, nationality, membership in a particular social group or political opinion. *See id.*

"Persecution encompasses more than threats to life or freedom; non-life threatening violence and physical abuse also fall within this category." *Id.* at 424. However, to sustain an asylum application, the conduct "must rise above mere harassment." *Roman*, 233 F.3d at 1034. This court has recognized that actions such as "detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture" might cross the line from harassment to persecution. *Mitev v. INS*, 67 F.3d 1325, 1330 (7th Cir. 1995).

There is no question that Ms. Ciorba has endured some harassment at the hands of local Romanian police. How-

---

[6] If an alien establishes past persecution, there is a rebuttable presumption that she also has a well-founded fear of future persecution and therefore should be granted asylum. *See Ambati v. Reno*, 233 F.3d 1054, 1059-60 (7th Cir. 2000).

ever, Ms. Ciorba never was arrested, jailed, physically assaulted or threatened. Additionally, she did not suffer extreme economic deprivation; Ms. Ciorba resided in her family's two-bedroom home and lived off of the funds provided by her family in the United States during the five years that she remained in Romania after their departure. In short, Ms. Ciorba's experiences in Romania are similar to those that this court has recognized as constituting harassment, not persecution. *See, e.g., Yadegar-Sargis v. INS*, 297 F.3d 596, 602 (7th Cir. 2002) (holding that being stopped by police, being interrogated, and being forced to the back of ration lines constituted harassment); *Mousa v. INS*, 223 F.3d 425, 430 (7th Cir. 2000) (holding that having to report to the police, being subject to regular questioning and surveillance, and having difficulty finding employment can "reasonably be characterized as mere harassment").[7]

Furthermore, we cannot say that the evidence compels a conclusion that Ms. Ciorba has a well-founded fear of future persecution in Romania. When asked directly what she feared if returned to Romania, Ms. Ciorba stated that she feared only additional questioning by the police and searches of her home. These actions "do not rise to the level of persecution under the statute. Consequently, they also cannot form the basis for a well-founded fear of future persecution." *Tamas-Mercea*, 222 F.3d at 426 (citing *Balazoski v. INS*, 932 F.2d 638, 640 (7th Cir. 1991), and *Zalega v. INS*, 916 F.2d 1257, 1261 (7th Cir. 1990)).

---

[7] As noted above, during closing statements to the IJ, Ms. Ciorba's counsel conceded that the harassment by the local Romanian police did not constitute persecution for purposes of asylum eligibility.

**D. Employment of the Board's Streamlining Procedure**

Ms. Ciorba also submits that the BIA abdicated its responsibility to review the IJ's decision when it summarily affirmed that decision without explanation pursuant to the new streamlining regulation, 8 C.F.R. § 3.1(a)(7). At oral argument, Ms. Ciorba's attorney made it clear that Ms. Ciorba was not mounting a facial challenge to the regulation; she only objected to the BIA's invocation of this procedure with respect to her case.

The applicable regulation, 8 C.F.R. § 3.1(a)(7), permits a single member of the Board to affirm the decision of the IJ without opinion if the Board member concludes that the decision is correct and that any errors in the decision are harmless. *See* 8 C.F.R. § 3.1(a)(7)(ii). Additionally, the single member must further determine either that "the issue on appeal is squarely controlled by existing Board or federal court precedent and does not involve the application of precedent to a novel fact situation," or that "the factual and legal questions raised on appeal are so insubstantial that three-Member review is not warranted." *Id.* (A) & (B).

Ms. Ciorba argues that her case should not have been streamlined. She maintains that the IJ committed numerous errors during the removal hearing that prejudiced her. Furthermore, she maintains, these errors were sufficiently serious to warrant review by a three-member panel of the Board. She requests that this court remand the case to the BIA for consideration by a panel as opposed to simply a single member.

As our review of this case demonstrates, Ms. Ciorba's case raises no substantial issue of law. Moreover, under existing precedent, there is no factual basis upon which to support a grant of asylum. Under these circumstances,

there certainly was no error in employing the streamlining regulation. This case simply does not present the sort of situation in which the collective judgment of the Board, as opposed to the review of one member, might well have resulted in a different assessment of the petitioner's case.

## Conclusion

For the foregoing reasons, the petition for review is denied, and the judgment of the BIA is affirmed.

PETITION FOR REVIEW DENIED; AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*

USCA-02-C-0072—3-21-03