[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 04-14782
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 8, 2005
THOMAS K. KAHN
CLERK

BIA No. A95-907-508

DIEGO ARISTIZABAL ESTRADA,

Petitioner,

versus

U. S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

**(July 8, 2005)**

Before ANDERSON, BIRCH and BLACK, Circuit Judges.

PER CURIAM:

Diego Aristizabal Estrada, through counsel, petitions for review of the Board of Immigration Appeals's ("BIA") order, which affirmed the Immigration Judge's ("IJ") determination denying Estrada asylum, withholding of removal and CAT[1] relief. Estrada's removal proceedings commenced after 1 April 1997, and therefore, the permanent rules of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (1996) ("IIRIRA") apply. The plain language of 8 U.S.C. § 1158(a)(3) forecloses judicial review of the BIA's decision regarding the untimely filing of Estrada's asylum application. Moreover, substantial evidence supports the BIA's findings that Estrada was not entitled to asylum under the Immigration and Nationality Act ("INA') because he failed to establish past persecution or a well-founded fear of future persecution. Likewise, Estrada failed to meet the higher burden to establish eligibility for withholding of removal or CAT. Accordingly, we **DISMISS** this petition in part and **DENY** it in part.

---

[1]The United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), 8 U.S.C. §§ 1158, 1241 (b)(3), 8 C.F.R. § 208.16(c)).

# I. BACKGROUND

On 1 May 2001, the Immigration and Naturalization Service ("INS")[2] served

Estrada with a notice to appear ("NTA"), alleging that he (1) was a native and

citizen of Colombia; (2) entered the United States on or about 25 April 2000, as a

non-immigrant visitor for pleasure, and (3) remained in the United States beyond

the amount of time authorized by the INS. The INS charged that Estrada was

subject to removal under INA § 237 (a)(1)(B), 8 U.S.C. § 1182(a)(1)(B).

Estrada, a Colombian citizen, subsequently filed an asylum and withholding

of removal application, alleging persecution on account of his nationality, political

opinion and membership in a particular social group. In his application for asylum,

Estrada stated that he was a political military target of the Revolutionary Armed

Forces of Colombia ("FARC") because of his "political participation and social

works with the peasants." AR at 111. Estrada maintained that he was a member of

the Conservative Party and vice-president of the Community Action Board

("CAB") in the village of Caicedonia, Valle del Cauca. He asserted that in order to

prevent the peasants "from abandoning the country," his organization would assist

the peasants in areas involving literacy and agriculture. AR at 111. Estrada

---

[2] On 25 November 2002, President Bush signed into law the Homeland Security Act of 2002 ("HSA"), Pub. L. No. 107-296, 116 Stat. 2125. The HSA created a new Department of Homeland Security ("DHS"), abolished the INS, and transferred its functions to the new department. However, because this case was initiated while the INS was still in existence, this opinion refers to the agency as the INS.

averred that the FARC recruited many peasants in the region, compelling them to abandon their farmland. He further stated that the peasants who did not want to be recruited were assassinated by the FARC in front of their family members. Estrada stated that as a result of his participation in the CAB, and the CAB's support of the peasants in that region, he suffered persecution, death threats, and a murder attempt from the FARC. Estrada also alleged two specific incidents during which he was threatened by the FARC which occurred in January and March of 2000.

Estrada submitted a number of documents in support of his asylum application. These documents included a police report filed on behalf of his sister, dated 18 December 2002, which stated that on 6 December 2002 and 18 December 2002, his sister received phone calls from the FARC asking about Estrada's whereabouts. These documents also included a letter from the (1) President of the Caicedonia Municipal Council stating that Estrada had "been a great political activist" in various campaigns in Caicedonia, Valle, and that according to Estrada's own accounts, he received death threats and left the municipality to save his life; (2) Nanciancenistar Conservative Directory attesting to the work Estrada had done for them; (3) Municipal Mayor of Caicedonia, Valle, explaining the FARC's impact in that region, and that as a result of the FARC's activities, Estrada was forced to leave the region; (4) Electoral Organization in Caicedonia, Valley certifying that Estrada served as a voting jury in Montealegre Village; and (5)

4

Municipal Representative's Office of Caicedonia, Valle, attesting to Estrada being an honest person, and that Estrada had to leave the region because of death threats from the FARC.

Also in the record is the State Department's 2002 Country Report on human rights practices for Colombia, which reflected that Colombia was a constitutional, multiparty democracy, in which the Liberal and Conservative parties had long dominated politics. Despite years of drug and politically related violence, the economy is diverse and relatively advanced, but the government's human rights record remains poor. Internal security is maintained by both the armed forces and the national police. As a result of a major internal armed conflict between the government and leftist guerillas, including the FARC and the National Liberation Army ("ELN"), 5,000 to 6,000 civilians were killed during the year, including combat casualties, political killings and forced disappearances. The rate of guerilla abuses increased during the year as they kidnaped thousands of civilians to help finance subversion and put political pressure on the government. Of the 2,986 kidnaping reported, 936 were attributed to the FARC. Guerillas caused mass displacements and thousands of civilian deaths and injuries through indiscriminate attacks on small towns and random terrorist bombings throughout the country. The report also stated that many of the unlawful killings committed by guerrillas were politically-motivated, and that the guerrillas, particularly the FARC, appeared to

5

have committed a higher percentage of Colombia's unlawful killings than the previous year.

At Estrada's removal hearing, he conceded removability and sought to proceed on his asylum application. At the asylum hearing, with the assistance of counsel, Estrada essentially reiterated the statements in his asylum application and added some information. Estrada clarified that he first worked as a consultant with the CAB, and in 2000, was named vice president of the group. Estrada stated that as vice president, he "had a more direct relationship with the peasant[s] of the neighborhood or town." AR at 74. He testified that he became a military target of the FARC because of his political and social assistance to the peasants through the Conservative Party. Estrada stated that he was the target of one "death attack," in December 1999. AR at 78. He testified that he was driving to his family's farm early in the morning and stopped because there were some trees in the road. He stated that he was shot at and threw himself in a ditch, but was not hurt. Estrada acknowledged that he did not file a police report about that incident. Estrada stated that during the January 2000 incident, the FARC commander told him that he was a military objective of the FARC, and if he continued to prevent recruitment, they were going to kill him. Estrada acknowledged, however, that he did not file a police report about the January 2000 incident either. He testified that he could not relocate within Colombia because the FARC would be able to find him anywhere

in Colombia. Estrada stated that he waited several years to file an asylum application because he was not familiar with this country's customs or INS laws. He also stated that he was advised that if his asylum application was denied, he could be deported.

On cross-examination, Estrada testified that he could not recall the date on which his sister was declared a military objective by the FARC, but that it was at least three years earlier. He added that his sister was protected by the municipal government and was in "constant movement" in Colombia. AR at 89-90. Estrada was then asked why the FARC, who knew where he lived and considered him a military objective, did not come to his home and kill him. He responded that once he found out he was a military target in March 2000, he traveled around Colombia while preparing to come to the United States. Estrada also testified that the other board members of the CAB remained in the region but were not military targets because "they [did not] have such a straight and direct relationship with peasants as [he] did." AR at 96.

The IJ denied Estrada's asylum and withholding application and ordered him removed to Colombia. In his oral decision, the IJ first noted that Estrada did not apply for asylum until approximately 23 months after he arrived in the United States, and that he claimed "he was afraid that filing an application would cause his deportation." AR at 41. Accordingly, the IJ found that Estrada's asylum

7

application was untimely, and that his reasons for the untimely filing did not constitute extraordinary circumstances. The IJ then pretermitted his asylum application. The IJ determined, however, that even if Estrada's asylum application were to be considered, his application would still be denied on the merits. The IJ reviewed Estrada's testimony and noted that there were no police reports regarding the December 1999, January 2000 or March 2000 incidents. The IJ also noted that after the March 2000 incident, Estrada testified that he traveled around Colombia without interference by anybody. The IJ stated that Estrada's parents still remained in Colombia and had not been harmed or threatened. Additionally, the IJ stated that although Estrada's sister was a military objective of the guerrillas, it "[was] difficult to fully understand" how she managed to remain in Colombia, under some type of governmental protection. AR at 45. The IJ noted that Estrada testified that the FARC was everywhere in Colombia, and could accomplish any goal that they intended to accomplish. The IJ also stated that Estrada's fellow board members at the CAB remained in the region and had not been disturbed. The IJ rejected Estrada's claim that he was the only CAB member targeted because he had a unique relationship with the peasants. Accordingly, the IJ denied Estrada's asylum application "both on the time issue, and in the alternative, on the merits." AR at 46. The IJ also found that Estrada did not meet his burden of proof for withholding of removal because there was no basis to conclude "that it

8

[was] more likely than not that [Estrada] would be subject to persecution if he was returned to Colombia." AR at 46. The IJ also rejected Estrada's application for CAT protection, finding that Estrada was never harmed and had failed to demonstrate "that it would be more likely than not that he would be tortured if he was returned to Colombia." AR at 47.

Estrada filed a notice of appeal to the BIA alleging that the IJ erred in denying his asylum and withholding of removal applications. Estrada argued that he demonstrated exceptional circumstances to excuse the late filing of his of his asylum application.

After considering the parties' arguments, the BIA adopted and affirmed the IJ's decision, stating that it agreed with the IJ's (a) finding that Estrada failed to establish an exception to the one-year deadline for filing asylum applications, (b) alternate finding that Estrada's asylum claim failed on the merits, and (c) determination that Estrada had failed to meet his burden of proof for withholding of removal under the INA or CAT.

9

## II.  DISCUSSION

### A.  Whether the BIA Erred in Denying Asylum Based on the Expiration of the One-Year Statute of Limitations Deadline

Estrada argues that the BIA erred by affirming the IJ's finding that Estrada failed to demonstrate extraordinary circumstances excusing the untimely filing of his asylum application.  Specifically, Estrada maintains that "[t]he lingering effects of the state of fear . . . produced a significant barrier to the timely filing of the application."  Appellant's Br. at 18.  Estrada asserts that his unfamiliarity with the asylum laws, "compounded with . . . a distraught state of mind," constituted extraordinary circumstances excusing the untimely filing of his asylum application. Id. at 19.

An alien may not apply for asylum unless he demonstrates by clear and convincing evidence that the application has been filed within one year of his arrival in the United States.  INA § 208(a)(2)(B); 8 U.S.C. § 1158(a)(2)(B).  The one-year filing period commences either on the date of the alien's arrival or on 1 April 1997, whichever is later.  8 C.F.R. § 208.4(a)(2)(ii).  A late application for asylum may be considered in the existence of extraordinary circumstances relating to the delay in filing the application.  INA § 208(a)(2)(B), (D); 8 U.S.C. § 1158(a)(2)(B), (D).  However, 8 U.S.C. § 1158(a)(3) states, "[n]o court shall have the jurisdiction to review any determination of the Attorney General under

10

paragraph (2) [the provision providing that the one-year time limit may be waived if extraordinary circumstances are demonstrated]." The Attorney General's decision regarding whether an alien complied with the one-year time limit or established extraordinary circumstances, such that the time limit should be waived, is not reviewable by any court. See Fahim v. U.S. Att'y General, 278 F.3d 1216, 1217-18 (11th Cir. 2002) (per curiam). Accordingly, the plain language of the statute and our case law bar review of the BIA's decision to deny asylum because the application was not filed within the one-year limit and no exceptional circumstances existed.

**B.** **Whether the BIA's Decision to Deny Asylum and Withholding of Removal is Supported by Substantial Evidence**

Estrada asserts that the BIA erred by affirming the IJ's denial of his asylum application on the merits. Estrada maintains that he provided sufficient evidence that he suffered past persecution from the FARC. He avers that the FARC threatened him after he was promoted to vice president of the CAB and continued his political activities with the peasants. In support, Estrada mentions the (a) January 2000 incident in which a FARC commander allegedly told Estrada that if he continued with his anti-guerilla activities, the FARC would kill him; and (b) March 2000 incident in which the FARC allegedly painted the walls of the farm with pro-FARC slogans, hanged his dog, and left a threatening note in its mouth.

11

Estrada alternatively asserts that he has presented a well-founded fear of future persecution in Colombia. Specifically, Estrada maintains that the FARC has continued its attempt to locate him, well after he left Colombia. He also avers that his family has continued to receive threatening telephone calls from the FARC and cites to a police report his family filed after one such incident. Estrada then maintains that he met his burden of proof for withholding of removal because it is more likely than not that he will be subject to persecution if he is returned to Colombia. In support, Estrada essentially reiterates the factual claims he provided in support of his asylum application. Finally, in a footnote, Estrada maintains that although the IJ denied his claim for relief under the CAT, the State Department's 2002 Country Report for Colombia indicates "that the Colombian government would be unable to control acts of torture by the FARC against [Estrada]." Appellant's Br. at 25-26 n.82.

As discussed above, we lack jurisdiction to review the BIA's and IJ's conclusions that Estrada's asylum claim was untimely and no extraordinary circumstances existed to excuse the untimely filing. However, as the BIA and IJ alternatively considered and denied Estrada's asylum claim on the merits, see AR at 2, 41-46, we will also address this finding as well their conclusions about the withholding of removal claim.

The BIA's factual determinations are reviewed under the substantial evidence test, and we "must affirm the BIA's decision if it is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). Under this highly deferential standard of review, the BIA's decision must be deferred to as supported by substantial evidence, unless the evidence compels a reasonable fact finder to find otherwise. Sepulveda v. United States Attorney Gen., 401 F.3d 1226, 1230 (11th Cir. 2005) (per curiam). We review only the BIA's decision, except when it adopts the IJ's decision, such that a review of that decision is warranted. Id. Here, the BIA both adopted the IJ's decision and made some of its own findings, so we should review both. Further, the BIA's decision can only be reversed if the applicant's evidence "is so powerful that a reasonable factfinder would *have* to conclude that the requisite fear of persecution exists." Mazariegos v. Office of the United States Attorney Gen., 241 F.3d 1320, 1323-24 (11th Cir. 2001) (emphasis in original). The INA states that "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." INA § 242(b)(4)(B), 8 U.S.C. § 1252(b)(4)(B).

Any alien who is physically present in or arrives in the United States may apply for asylum. INA § 208(a)(1), 8 U.S.C. § 1158(a)(1). An alien may obtain asylum if he is a refugee within the meaning of INA § 101(a)(42)(A), 8 U.S.C.

13

§1101(a)(42)(A). A "refugee" includes any person who is unwilling to return to, and is unable or unwilling to avail himself of the protection of, the country of his nationality or where he last habitually resided, "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Id. The burden of proof is on the alien to establish that he is a refugee. 8 C.F.R. § 208.13(a). An alien may establish eligibility for asylum if he shows that he has suffered past persecution or has a well-founded fear of future persecution. Id. § 208.13(b), Al Najjar, 257 F.3d at 1287. While the INA does not define persecution, courts have generally held that persecution is "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate." See, e.g. Tamas-Mercea v. Reno, 222 F.3d 417, 424 (7th Cir. 2000) (punctuation omitted). "Persecution encompasses more than threats to life or freedom; non-life threatening violence and physical abuse also fall within this category." Id. We have observed that mere harassment is not persecution, and persecution requires "'more than a few isolated incidents of verbal harassment or intimidation.'" Sepulveda, 401 F.3d at 1231; see also Nelson v. INS, 232 F.3d 258, 263 (1st Cir. 2000) (persecution "must rise above unpleasantness, harassment, and even basic suffering").

14

Past persecution includes persecution that occurred in the applicant's country in the past "on account of . . . political opinion," and the applicant "is unable or unwilling to return to, or avail . . . himself of the protection of, that country owing to such persecution." 8 C.F.R. § 208.13(b)(1). A "well-founded fear" of persecution may be established by showing, (1) past persecution that creates a presumption of a "well-founded fear" of future persecution, which may be rebutted with proof that, inter alia, the alien could relocate and it would be reasonable to expect the alien to do so, (2) a reasonable possibility of future personal persecution that cannot be avoided by relocating within the subject country, or (3) a pattern or practice in the subject country of persecuting members of a statutorily defined group of which he is part. 8 C.F.R. § 208.13(b)(1), (b)(2). The well-founded fear inquiry requires the alien to demonstrate that his or her fear of persecution "'is subjectively genuine and objectively reasonable.'" Sepulveda, 401 F.3d at 1231. Further, the alien must establish a causal connection between the statutory ground and the feared persecution by presenting "'specific, detailed facts showing a good reason to fear that he or she will be *singled out* for persecution on account of [the statutory ground].'" Id. (emphasis in original). Finally, after establishing a well-founded fear of persecution, the alien must demonstrate that he or she cannot avoid the persecution by relocating within the country. Id.

15

Substantial evidence supports the BIA's determination that Estrada failed to establish that he suffered past persecution or will suffer future persecution on account of his political opinions or community involvement. Estrada testified about an alleged 1999 attack from the FARC; January 2000 incident in which a FARC commander allegedly warned Estrada; and a March 2000 incident in which the FARC allegedly killed his dog, and left a threatening note in its mouth. However, he did not produce a police report for any of these incidents, and after the March 2000 incident, he was able to travel around Colombia, for a month, without interference by anybody. This evidence supports a conclusion that Estrada had not suffered past persecution within the meaning of the INA. While the record may have supported another conclusion, we affirm the IJ's reasonable interpretation that Estrada failed to establish that he was persecuted to warrant asylum. See Mazariegos, 241 F.3d at 1324. Estrada never testified that he was physically harmed, kidnaped, abused, or anything other than merely being harassed by the FARC. See Sepulveda, 401 F.3d at 1231(mere harassment is not persecution); Nelson, 232 F.3d at 264 (the alien did not face persecution, or have a well-founded fear of persecution, when she was three times placed in solitary confinement and physically abused, and subjected to periodic surveillance, threatening phone calls, occasional stops and searches and visits to her place of employment).

Similarly, the IJ and BIA's findings that Estrada did not have a "well-founded fear" of future persecution because (a) Estrada's family remains in Colombia and has not been harmed by the FARC; (b) his sister, who he claimed was currently a military target of the FARC, manages to remain in Colombia under some governmental protection; and (c) the other Board Members of the CAB are not targeted by the FARC, are supported by substantial evidence. Although Estrada testified that he, unlike other Board Members, had a special relationship with the peasants; and presented documented evidence that the FARC made two threatening telephone calls after his departure from Colombia, the substantial evidence in the record supports the IJ's findings, and a reasonable factfinder would not be compelled to disagree.  See Mazariegos, 241 F.3d at 1323-24.  Also, as stated above, mere harassment is not persecution, and persecution requires "'more than a few isolated incidents of verbal harassment or intimidation.'" Sepulveda, 401 F.3d at 1231.

### III.  CONCLUSION

Upon review of the record, and having considered the briefs of the parties, we discern no reversible error.   Based upon the foregoing, we **DISMISS** in part and **DENY** in part.

17