# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 04-1700

ZHEN LI IAO[*]

                                       *Petitioner*,

                *v.*

ALBERTO R. GONZALES,

                                     *Respondent.*

_____

Petition to Review Order of the
Board of Immigration Appeals.
No. A 79 089 633

_____

ARGUED JANUARY 26, 2005—DECIDED MARCH 9, 2005

_____

Before POSNER, MANION, and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*. An immigration judge ordered the petitioner, a citizen of China seeking asylum in the United States, to be removed (deported) from the United States, and the Board of Immigration Appeals affirmed without opinion. The basis of the immigration judge's ruling was that the petitioner is not entitled to asylum because she lacks

_____

[*] This is the name that appears in the final order of the Board of Immigration Appeals and in the docket and briefs in this court. But the record reveals that the petitioner's name is actually Xiuzhen Li, and that is the name we'll use in the opinion.

a well-founded fear of being persecuted by the Chinese government should she return to China.

A woman in her early 20s, Li arrived in the United States in 2000. At the removal hearing she testified through an interpreter that she had begun to practice Falun Gong in China and—the Chinese government having outlawed Falun Gong in 1999—that police and village officials had learned of her activity (probably through her employer) and decided to investigate. Village officials made repeated visits to the house in which she lived with her parents to tell her to abandon Falun Gong, but she eluded them by residing mainly in her aunt's house. Police visited the parents' home and delivered a summons commanding Li to come to the police station for an interview. She did not comply with the summons. They kept coming back to the home, looking for her, and she fled the country.

Since arriving in the United States, Li has, again according to her testimony, practiced Falun Gong in Chicago (where she lives) and has also participated in street demonstrations against the Chinese government's persecution of the movement. When she arrived in this country she knew the name of the founder of Falun Gong (Li Hongzhi, now in exile in the United States) and had done the physical exercises that are the primary manifestation of adherence to Falun Gong, but she was vague about its doctrines and unfamiliar with its symbol. She has since become more familiar with the movement's doctrines and symbol. At the hearing before the immigration judge she presented letters from her mother in China, and the Chinese man who had introduced her to Falun Gong there, corroborating her testimony.

Falun Gong is an international movement, though primarily Chinese, that is often referred to as a "religion" (or, by its critics, as a "cult"), though it is not a religion in the

Western sense. Like other Asian "religions," such as Buddhism and Confucianism—on both of which Falun Gong draws—there is no deity. The emphasis is on spiritual self-perfection through prescribed physical exercises; in this respect the movement has affinities with traditional Chinese medicine.

The government acknowledges that China persecutes adherents to Falun Gong and that an applicant for asylum need not have experienced persecution (Li has not) in order to have a well-founded fear of future persecution, *Diallo v. Ashcroft*, 381 F.3d 687, 699 (7th Cir. 2004); *Sivaainkaran v. INS*, 972 F.2d 161, 165 n. 2 (7th Cir. 1992); *Knezevic v. Ashcroft*, 367 F.3d 1206, 1212 (9th Cir. 2004), which suffices for a claim of asylum. *Capric v. Ashcroft*, 355 F.3d 1075, 1084-85 (7th Cir. 2004); *Yadeger-Sargis v. INS*, 297 F.3d 596, 601-02 (7th Cir. 2002); *Krastev v. INS*, 292 F.3d 1268, 1270 (10th Cir. 2002). As Falun Gong is neither theistic nor, so far as appears, political, the ferocious antipathy to it by the Chinese government—that government's determination to eradicate it root and branch—is mysterious, but undeniable. See, e.g., *Zhang v. Ashcroft*, 388 F.3d 713, 716, 719 (9th Cir. 2004) (per curiam). If Li practiced Falun Gong in China, as she testified she did, or if she attempted to practice it upon returning to China, she would face a substantial likelihood of persecution. She might be able to conceal her adherence to Falun Gong from the authorities, but the fact that a person might avoid persecution through concealment of the activity that places her at risk of being persecuted is in no wise inconsistent with her having a well-founded fear of persecution. *Id.* at 719 ("to require Zhang to practice his beliefs in secret is contrary to our basic principles of religious freedom and the protection of religious refugees"); *Muhur v. Ashcroft*, 355 F.3d 958, 960-61 (7th Cir. 2004). On the contrary, it is the existence of such a fear that motivates the concealment.

The immigration judge gave five reasons for nevertheless denying Li's application for asylum. The first is that she was not persecuted in China. But she does not claim to have been; it is a nonissue. The fifth reason is that her brother, who lives in the United States, is a follower of Falun Gong yet failed to submit an affidavit attesting that his sister is too. The judge misread the record; the brother is *not* a follower of Falun Gong.

Reasons 2 through 4 overlap. Reason 2 is that Li failed to present persuasive evidence that she is a follower of the movement, because in her testimony she was "quite vague concerning her beliefs." For example, she didn't know that Falun Gong has a symbol (the "Falun Wheel" composed of reverse swastikas, a Buddhist symbol). But the heart of Falun Gong observance is the exercises, which she testified without contradiction that she does.

Reason 3 was that there were inconsistencies in her testimony about the visits of the police to her home. This was not, as the immigration judge thought, an independent reason for denying the application for asylum; rather, it was a reason not to credit her testimony about being a member of Falun Gong. The inconsistencies were trivial, however, and may well have been due to the fact that Li was testifying through an interpreter who appears not to have had a good command of English. When Li testified about the delivery of the summons to her home by the police, the immigration judge asked her whether she had had any prior "confrontations" with the government and she said no, but later explained that although the police didn't start coming to her home until they served the summons, village officials had visited earlier. Were these "confrontations"? She was never at home when they visited. And goodness knows how the translator translated "confrontations" into Chinese.

Reason 4 was that when interviewed by an asylum officer at the time she first applied for asylum, Li testified that after the village officials got wind of her involvement with Falun Gong she "went into hiding at different locations and never went back home." The immigration judge said that she "did not specifically testify in this manner (e.g. that she went into hiding) nor does the rest of the record support this statement." That is not correct. Although Li (more precisely, the translator) did not use the word "hiding," she said she wasn't at home when the police visited and that sometimes she was "at my aunt that I mentioned at her house." Apparently the village officials and police visited her home repeatedly, and since she was never there when they showed up it is a logical inference, supported also by her mother's letter, that she was indeed trying to evade the authorities.

The immigration judge's opinion cannot be regarded as reasoned; and there was no opinion by the Board of Immigration Appeals. So we have to vacate the decision and send the matter back to the immigration service. We do not decide that Li is entitled to asylum; that is a decision for the immigration authorities to make. But she is entitled to a rational analysis of the evidence by them.

The number of followers of Falun Gong in China is estimated to be in the tens of millions, all of them subject to persecution. And among the other billion Chinese there are doubtless many who would prefer to live in the United States than in China. Falun Gong, unlike, say, Judaism or Roman Catholicism or Jehovah's Witnesses, does not appear to have any formal requirements for membership; indeed, it has no membership. Anyone, we suppose, can get hold of a book of Li Hongzhi's teachings, start doing the exercises, and truthfully declare himself or herself a bona fide adherent to Falun Gong. The implications for potential Chinese

immigration to the United States may be significant, though in this circuit there have been only two litigated applications for asylum based on fear of persecution for being an adherent (or for being believed by the Chinese authorities to be an adherent) of Falun Gong, *Liu v. Ashcroft*, 380 F.3d 307 (7th Cir. 2004); *Yu v. Ashcroft*, No. 03-3965, 2004 WL 3103070 (7th Cir. Dec. 28, 2004) (unpublished order), and in the federal courts as a whole there have been only a couple of dozen such cases since 2003. The United States has every right to control immigration. But Congress has not authorized the immigration service to do so by denying asylum applications in unreasoned decisions.

We close by noting six disturbing features of the handling of this case that bulk large in the immigration cases that we are seeing:

1. *A lack of familiarity with relevant foreign cultures. Yi-Tu Lian v. Ashcroft*, 379 F.3d 457, 459 (7th Cir. 2004); Joanna Ruppel, "The Need for a Benefit of the Doubt Standard in Credibility Evaluation of Asylum Applicants," 23 *Colum. Human Rts. L. Rev.* 1, 14-15 (1992). The immigration judge offered no justification for regarding a person's lack of knowledge of Falun Gong doctrines as evidence of a false profession of faith. Different religions attach different weights to different aspects of the faith. Falun Gong, remember, is not theistic; nor is it hierarchical. So far as appears, what is central is neither doctrine nor symbol, but the exercises. Benoît Vermander, "Looking at China Through the Mirror of Falun Gong," 35 *China Perspectives* 4 (May-June 2001), http://www.cefc.com.hk/uk/pc/articles/art_ligne.php?num_art_ligne=3501 ("the absence of any formal rituals and organisation would make it impossible to consider Falun Gong precisely as a religion. Where rituals are concerned, however, it seems to us that one must consider the communal practice of exercises, alternated with peaceful

protests, as the movement's own ritual arsenal"); Anne S. Y. Cheung, "In Search of a Theory of Cult and Freedom of Religion in China: The Case of Falun Gong," 13 *Pac. Rim L. & Policy J.* 1, 28 (2004) ("those who believe in Falun Gong dedicate themselves to the exclusive practice of this exercise as a means to achieve enlightenment. In this sense, manifestation and belief are united").

2. *An exaggerated notion of how much religious people know about their religion. Muhur v. Ashcroft, supra*, 355 F.3d at 959-60. Of course a purported Christian who didn't know who Jesus Christ was, or a purported Jew who had never heard of Moses, would be instantly suspect; but many deeply religious people know very little about the origins, doctrines, or even observances of their faith.

3. *An exaggerated notion of the availability, especially in poor nations, of documentary evidence of religious membership. Id.; Qiu v. Ashcroft*, 329 F.3d 140, 154 (2d Cir. 2003). An acephalous, illegal religious movement is particularly unlikely to issue membership cards. The immigration judge's zeal for documentation reached almost comical proportions when after Li had testified at length and in considerable detail about locations, including the street in front of the Chinese consulate in Chicago, in which she had participated in demonstrations against the persecution of Falun Gong, he upbraided her for having "failed to submit to the Court any letters or photographs or any other evidence whatsoever to corroborate these claims." Since the demonstrators are mainly Chinese who might one day want or be forced to return to China, they are hardly likely to be taking photos of each other demonstrating, or to be creating other documentary proof of participating in demonstrations of which the Chinese government deeply disapproves.

4. *Insensitivity to the possibility of misunderstandings caused by the use of translators of difficult languages* such as Chinese,

and relatedly, *insensitivity to the difficulty of basing a determination of credibility on the demeanor of a person from a culture remote from the American*, such as the Chinese. E.g., *Lin v. Ashcroft*, 385 F.3d 748, 756 n. 1 (7th Cir. 2004); *Ememe v. Ashcroft*, 358 F.3d 446, 451-53 (7th Cir. 2004); *Mendoza Manimbao v. Ashcroft*, 329 F.3d 655, 662 (9th Cir. 2003); *He v. Ashcroft*, 328 F.3d 593, 598 (9th Cir. 2003); Deborah E. Anker, "Determining Asylum Claims in the United States: A Case Study on the Implementation of Legal Norms in an Unstructured Adjudicatory Environment," 19 *N.Y.U. Rev. L. & Social Change* 433, 505-27 (1992); Neal P. Pfeiffer, "Credibility Findings in INS Asylum Adjudications: A Realistic Assessment," 23 *Tex. Int'l L.J.* 139 (1988). Behaviors that in our culture are considered evidence of unreliability, such as refusing to look a person in the eyes when he is talking to you, are in Asian cultures a sign of respect.

5. *Reluctance to make clean determinations of credibility.* *Gontcharova v. Ashcroft*, 384 F.3d 873, 877 (7th Cir. 2004); *Diallo v. Ashcroft*, *supra*, 381 F.3d at 698-700; *Mendoza Manimbao v. Ashcroft*, *supra*, 329 F.3d at 660-61; *Diallo v. Ashcroft*, 232 F.3d 279, 287 (2d Cir. 2000). When an immigration judge says not that he believes the asylum seeker or he disbelieves her but instead that she hasn't carried her burden of proof, the reviewing court is left in the dark as to whether the judge thinks the asylum seeker failed to carry her burden of proof because her testimony was not credible, or for some other reason.

6. *Affirmances by the Board of Immigration Appeals either with no opinion or with a very short, unhelpful, boilerplate opinion*, even when, as in this case, the immigration judge's opinion contains manifest errors of fact and logic.

We do not offer these points in a spirit of criticism. The cases that we see are not a random sample of all asylum

cases, and the problems that the cases raise may not be representative. Even if they are representative, given caseload pressures and, what is the other side of that coin, resource constraints, it is possible that nothing better can realistically be expected than what we are seeing in this and like cases. But we are not authorized to affirm unreasoned decisions even when we understand why they are unreasoned.

The petition for review is granted and the matter returned to the immigration service for further proceedings consistent with this opinion.

A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*