In the

# United States Court of Appeals
## For the Seventh Circuit

―――――――

No. 06-3178

MPOYI MITONDO,

*Petitioner*,

*v.*

MICHAEL B. MUKASEY, Attorney General
of the United States,

*Respondent*.

―――――――

Petition for Review of an Order of the
Board of Immigration Appeals

―――――――

ARGUED AUGUST 8, 2007—DECIDED APRIL 24, 2008

―――――――

Before EASTERBROOK, *Chief Judge*, and COFFEY and
MANION, *Circuit Judges*.

EASTERBROOK, *Chief Judge*.   Mpoyi Mitondo, a citizen
of the Democratic Republic of the Congo (known as
Zaire between 1971 and 1997), arrived in the United States
from Scotland bearing a French passport. Citizens of
France do not need visas to enter the United States, and
Mitondo did not have one.

Only cursory checks are made of persons who carry
the passports of nations participating in the visa-waiver
program. But one of the checks is for the passport's legiti-

macy, and Mitondo was detained because a blank bearing the number of the passport he presented had been stolen. He soon confessed that the passport was not his, and that he is not French. His request to stay in the United States has been processed under the "asylum-only" approach applicable to those who claim entitlement to enter without visas. Before arriving, Mitondo had waived any ground other than asylum for remaining in the United States beyond 90 days. See 8 U.S.C. §1187(b)(2); 8 C.F.R. §217.4(a)(1).

Mitondo contends that he has been persecuted on account of his politics. He supports the Union for Democracy and Social Progress (Union pour la Démocratie et le Progrès Social, or UDPS), which is on the outs with the ruling People's Party for Reconstruction and Democracy. UDPS is a recognized party with representatives in the legislature, and its leader Étienne Tshisekedi wa Mulumba served three stints as Prime Minister. But supporters of the UDPS sometimes receive rough handling from the police during political demonstrations. Mitondo testified that he endured ghastly treatment during May 2005, after Joseph Kabila, Congo's President, postponed scheduled elections. The UDPS called a general strike, and Mitondo says that during a demonstration in Mbuji-Mayi he was arrested, thrown into a filthy cell where his hands were tied behind his back and a hood kept over his head, beaten four times, and then sent to the fields for forced labor—from which he escaped after two weeks. Mitondo met Roman Catholic priests who helped him to escape to Zambia, where a second group of priests provided him with tickets and (false) documentation that enabled him to reach Glasgow, receive the stolen passport, and enter the United States equipped with a voucher for prepaid stay at a youth hostel in Chicago.

The immigration judge accepted Mitondo's claim to membership in the UDPS (a claim backed up by the party's records and affidavits from its officials) but was skeptical about the story of his detention and beatings in May 2005. The voucher had been issued in Glasgow to a "V. Mitondo," the same name on the passport, before Mitondo had escaped from his captors and thus before he could have met the priests—about whom he has supplied no details. Asked to explain how this could be so, Mitondo replied: "I don't know how they arranged these travel documents or how they arranged any, any of this."

After a six-week continuation so that both sides could gather additional evidence, Mitondo's memory improved. Now he testified that the person in Glasgow who gave him the documents told him that a Vital Mitondo had planned to travel to the United States but had backed out. Mpoyi's photograph then replaced Vital's on the passport, and Mpoyi claimed to be Vital in order to use the voucher. The IJ was skeptical of this story and continued the hearing to allow forensic examination of the passport. An expert concluded that the document was "free from any conclusive physical evidence indicating data entry alteration, page substitution, or photo-substitution." In other words, Mpoyi's photo was the first to have been placed on the stolen blank. Mitondo had no explanation for this, which demolished his revised story.

The IJ then denied Mitondo's application for asylum, finding that he was willing to lie to enter the United States—Mitondo concedes as much in light of the bogus claim of French citizenship—and had lied about the events of May 2005 in particular. Cf. *Alsagladi v. Gonzales*, 450 F.3d 700 (7th Cir. 2006) (fraud in obtaining entry to the United States is a good reason to reject a request for

asylum). The IJ relied on three particular discrepancies: First, the hostel voucher was issued before Mitondo claims to have met the priests; second, Mitondo's testimony that he took over travel documents from someone else is inconsistent with his earlier sworn statement that he had no idea how the documentation was arranged; third, the forensic evidence undercut Mitondo's second story about how his surname and picture came to be on the stolen passport. The Board of Immigration Appeals affirmed.

Jurisdiction is the first question. Because Mitondo was placed in asylum-only proceedings following his failed effort to enter the United States, no formal order of removal has been entered. A court of appeals reviews final orders of removal, 8 U.S.C. §1252(a)(1), but, for reasons given in *Jiménez Viracacha v. Mukasey*, No. 07-1548 (7th Cir. Mar. 3, 2008), an order that is proper only if the alien is remov*able* implies an order of removal. At least three other courts of appeals have reached the same conclusion and have held that there is jurisdiction to review the final disposition of an asylum-only proceeding. See *Shehu v. Attorney General*, 482 F.3d 652, 656 (3d Cir. 2007); *Kanacevic v. INS*, 448 F.3d 129, 134–35 (2d Cir. 2006); *Nreka v. Attorney General*, 408 F.3d 1361, 1366–67 (11th Cir. 2005).

Mitondo's principal argument is that the agency's decision is not supported by substantial evidence, because the problems that the IJ identified do not "go to the heart of" his claim for asylum. Many decisions, in this and other circuits, state that inconsistencies on minor details do not justify disbelief of an alien's claim to have suffered persecution. See, e.g., *Giday v. Gonzales*, 434 F.3d 543, 551–52 (7th Cir. 2006). Mitondo observes that none of the IJ's reasons concerns the events that (he maintains) occurred in Mbuji-Mayi in May 2005. Some other evidence

in the record suggests that a crackdown on UDPS members began in June 2005, and the documents that Mitondo presented to establish his membership in the UDPS do not show his presence in Mbuji-Mayi during May 2005 (though they do establish his activities on behalf of the party in earlier months). But the IJ did not mention these problems and so, Mitondo maintains, the judiciary can't rely on them either. See *SEC v. Chenery Corp.*, 318 U.S. 80, 88–89 (1943); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

Dissatisfied with judicial reluctance to accept immigration judges' credibility decisions, Congress enacted this provision in 2005 as part of the Real ID Act:

> Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor. There is no presumption of credibility, however, if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal.

8 U.S.C. §1158(b)(1)(B)(iii). This subsection applies only to claims for asylum made after May 11, 2005, see 119 Stat. 230, 305 (2005), and Mitondo's application is the first time this circuit has been required to apply the new law.

This statute abrogates decisions that focus on "whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim". It also specifies that "[t]here is no presumption of credibility". Beyond that, the statute requires courts to use in immigration proceedings the same deferential approach traditionally applied to credibility findings in labor cases and other administrative controversies. See, e.g., *Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951); *Elliott v. CFTC*, 202 F.3d 926 (7th Cir. 2000).

Asylum cases pose thorny challenges in evaluating testimony. Applicants regularly tell horrific stories that, if true, show past persecution and a risk of worse to come. But these stories rarely are susceptible to documentary proof, because persecutors don't publish records of their misdeeds. (Though they sometimes *keep* such records, they remain secret until the regime has fallen.) Countries that oppress their citizens may be disordered in other ways—so that, for example, medical records are unreliable, and victims cannot use them to demonstrate injuries received at the hands of police, or may record events in ways that complicate interpretation (for example, whether an abortion was compulsory or voluntary may be omitted from the file or noted in a way that foreigners find opaque).

Most claims of persecution can be neither confirmed nor refuted by documentary evidence. Even when it is certain that a particular incident occurred, there may be doubt about whether a given alien was among the victims.

Then the alien's oral narration must stand or fall on its own terms. Yet many aliens, who want to remain in the United States for economic or social reasons unrelated to persecution, try to deceive immigration officials. Often they are coached by friends or organizations that disapprove of this nation's restrictions on immigration and do what they can to help others remain here. Occasionally the coaches (like smugglers who provide transportation and bogus credentials) do this for pay rather than out of friendship or commitment. How is an immigration judge to sift honest, persecuted aliens from those who are feigning?

The belief that many people form from watching television and movies—that this can be done by careful attention to a witness's demeanor—has been tested and rejected by social scientists. Looking for mannerisms, hesitations, and perspiration is the method of the lie detector without the polygraph machine. In a large-scale test of lie-detecting abilities, in which people told matched pairs of true and false stories, a television audience (which had access to the speakers' demeanor) did no better than chance at separating truth from fiction, while newspaper readers spotted the lie 64% of the time and people listening to the radio got it right 73%. Richard Wiseman, *Quirkology: How We Discover the Big Truths in Small Things* 50–81 & references at 287–90 (2007). In other words, if you want to find a liar you should close your eyes and pay attention to *what* is said, not *how* it is said or what the witness looks like while saying it. See Stephen Porter & John C. Yuille, *The Language of Deceit: An Investigation of the Verbal Cues to Deception in the Interrogation Context*, 20 L. & Human Behavior 443 (1996); Michael J. Saks, *Enhancing and Restraining Accuracy in Adjudication*, 51 L. & Contemp. Probs. 243, 263–64 (Aut. 1988). And even then the error rate is high.

So what gives the liar away? Wiseman's book recounts what is known about this subject. The major clue, apart from factual gaffes and inconsistencies that amount to confessions, is the amount of detail. "When it comes to lying, the more information you give away, the greater are the chances that some of it will come back to haunt you. As a result, liars tend to say less, and to provide fewer details". *Id*. at 58–59. What's more, "[l]iars often try to distance themselves psychologically from their falsehoods, and so they tend to include fewer references to themselves, and their feelings, in their stories*." Id*. at 59. Truth-tellers have normal amounts of memory failure. But "[w]hen it comes to relatively unimportant information, [liars] seem to develop super-powered memories and often recall the smallest of details. In contrast, truth-tellers know that they have forgotten certain details and are happy to admit it*." Id*. at 59–60. In a nutshell: details matter, and the story's periphery may expose a liar. This is not a novel point; our opinion in *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004), says much the same thing, in reliance on these empirical findings.

In immigration cases an additional set of clues may be available. An alien who is repeating a story fed to him by handlers may be able to testify up to a certain point but then run out of information at the place where the briefing stopped. The IJ suspected that of Mitondo, who professed ignorance about travel documentation at the first hearing, then recited a detailed story on this topic at the second hearing.

The immigration judge paid close attention to the details of Mitondo's story, which did not hang together even after its amendment. Mitondo's current explanation for the shortcomings—that he was confused or

nervous—is generic and would make it impossible to disbelieve any story, however fanciful. The IJ was not obliged to believe that Mitondo was too jittery to produce an internally consistent story. Substantial evidence supports the agency's decision that he is not credible.

When documentary proof one way or the other is unavailable, the agency must use the details of an alien's story to make an evaluation of its truth. Section 1158(b)(1)(B)(iii) permits it to do so, using whatever combination of considerations seems best in the situation at hand. This is not to say that an IJ may make irrational assumptions about how dictators subjugate their citizens, see *Banks v. Gonzales*, 453 F.3d 449 (7th Cir. 2006), or how the society of a foreign nation operates, see *Pramatarov v. Gonzales*, 454 F.3d 764 (7th Cir. 2006); *Grupee v. Gonzales*, 400 F.3d 1026 (7th Cir. 2005); *Zhen Li Iao v. Gonzales*, 400 F.3d 530 (7th Cir. 2005). Those are subjects on which proof is available. Once the background facts about the alien's native land have been assembled, however, and a question remains about whether the applicant is among that nation's victims, §1158(b)(1)(B)(iii) permits the agency to make a decision despite the irreducible uncertainty in any evaluation of oral testimony.

Mitondo's other arguments were not presented to the Board of Immigration Appeals and have been forfeited.

The petition for review is denied.