In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3512

SHAN ZHU QIU,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent*.

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A099-023-327

ARGUED APRIL 8, 2010—DECIDED JULY 12, 2010

Before RIPPLE, MANION, and TINDER, *Circuit Judges*.

TINDER, *Circuit Judge*.  In December 2004, Shan Zhu Qiu lost his job and moved back to his parents' home outside Fuzhou, China. At a dinner there, he reconnected with a childhood friend, who noted that Qiu looked weak and thin and offered to take him to a qigong teacher who would help him get in shape for free. Qiu had been sleeping poorly and thought exercise

might help, and the price was right, so he agreed to go to a lesson. Qigong is a popular form of exercise in China that involves "coordinating slow movements with breathing to cultivate the flow of energy, or qi, in a sort of graceful fluid dance." Nora Isaacs, *Exercisers Slow it Down with Qigong*, New York Times, April 5, 2007.

Qiu's first lesson took place in February 2005 at his friend's house; Qiu arrived, exercised for about thirty minutes and met the qigong teacher, the "master." Three days later, Qiu met his friend in front of his house and they went to a different location and practiced again. Qiu went to several more sessions, which were held in constantly shifting locations, and finally got curious about why the group was moving around so much. At this point, his friend informed him that the form of qigong the group was practicing was Falun Gong.

Falun Gong is strictly prohibited by the Chinese government, which considers it an "evil cult." It was originally practiced openly in China, but the Chinese government criminalized it after Falun Gong adherents staged a massive protest outside the Chinese Communist Party headquarters during the tenth anniversary of the 1989 pro-democracy Tiananmen Square demonstrations. The protest was a response to increasingly negative portrayals of Falun Gong in the state-run media. Ironically, the strength of the protests confirmed the fears that prompted the negative state media coverage of Falun Gong and the government's position on Falun Gong changed from disfavor to an outright ban. See Andrew Jacobs, *China Still Presses Crusade Against Falun Gong*, N.Y.

Times, April 28, 2009, and Craig S. Smith, *The World: Rooting Out Falun Gong; China Makes War on Mysticism*, N.Y. Times, April 30, 2000, for more details on the development of the relationship between Falun Gong and the Chinese government.

Finding out that he was practicing Falun Gong was, understandably, kind of a nasty shock for Qiu. He believed that if he were caught practicing, he would be detained for months. But he decided to continue for three reasons. First, he was seeing health benefits from his practice and was sleeping through the night. Second, he was sure that if the group were careful, it could practice in safety, undetected by the authorities. Third, his experience with his Falun Gong practice convinced him that he was not involved in an evil cult.

A little more than a month later, his master was arrested. Qiu received a call from his friend who told him that their practice had been reported and that the authorities were looking for all of the group's members. Qiu returned to his parents' home to get his things and prepare to go into hiding. The police arrived as he was packing, forcing him to jump off the balcony behind the house to escape. He hiked on a mountain trail into Fuzhou, called his family, sold his cell phone, and bought a train ticket to Yiwu. From there, he checked in with his family who reported that the police had served an official summons on him at their house. His family, fearing for his safety, told him not to come back.

After a month, Qiu ran out of money, took a train back to Fuzhou, and went to a nearby relative's house for

help. The relative told him that the police had been looking for him, found him a place to hide, and began making arrangements for Qiu to flee the country. For a fee equivalent to $70,000, the family arranged for a smuggler to get Qiu a false passport and get to the United States. Qiu arrived at O'Hare Airport, was stopped by authorities, and asked for asylum.

While his asylum case was proceeding over here, according to Qiu, the police came to his family's home three times and left summonses on at least two occasions (in May 2005 and 2006), which Qiu's mother sent to him here in the States. Qiu also continued to practice Falun Gong in the States, and on at least one occasion protested in front of the Chinese Consulate in Chicago by practicing there. He testified that there were cameras at the consulate recording the protest and he is certain that the police are looking for him and that he will be arrested when he returns to China.

To be eligible for asylum, a petitioner must qualify as a refugee under 8 U.S.C. § 1101(a)(42)(A). A refugee is someone who is unable or unwilling to return to his home country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. *Id*. Qiu argues that as a practitioner of Falun Gong he has a well-founded fear of persecution if forced to return to China. We have defined persecution to include "detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, torture, behavior that threatens

the same, and non-life-threatening behavior such as torture and economic deprivation if the resulting conditions are sufficiently severe." *Capric v. Ashcroft*, 355 F.3d 1075, 1084 (7th Cir. 2004) (quotations omitted).

Qiu had a hearing before an Immigration Judge, who found that he was not eligible for asylum in the United States (and therefore ineligible for withholding of removal and protection under the Convention Against Torture, *see Mabasa v. Gonzales*, 455 F.3d 740, 746-47 (7th Cir. 2006)). Qiu presented the evidence, described above, that he fled China to escape persecution on account of his practice of Falun Gong, that he had protested by practicing Falun Gong here in America, that the Chinese were aware of his activities, and, relying on State Department reports, that Falun Gong petitioners were persecuted in China. This evidence, he argued, showed that he had a well-founded fear of future persecution. The IJ disagreed and the Board of Immigration Appeals affirmed. Qiu petitions for review. As presented to us, the single issue in this case is whether substantial evidence supports the decision below that Qiu has not established a well-founded fear of future persecution as a result of his Falun Gong practice. We review the decision of the Board under the substantial evidence standard and will reverse only if the evidence compelled the contrary result. *Gjerazi v. Gonzales*, 435 F.3d 800, 807 (7th Cir. 2006).

The IJ did not challenge Qiu's credibility, but did find the summonses that were entered into evidence "unreliable." The IJ found that Qiu did not suffer past persecu-

tion in China because he was never detained, punished, or physically harmed there. The fact that the police sought Qiu for questioning was insufficient, the IJ found, to establish the level of persecution necessary to qualify as a refugee. Qiu does not challenge this point.

At the same time, the IJ found Qiu's "limited participation in Falun Gong practice in China insufficient to establish a well-founded fear of future persecution." The IJ found that the State Department country reports for China offered by Qiu (specifically the 2007 Report on Religious Freedom and the 2006 Report on Human Rights Practices) were insufficient to establish that his fear of future persecution was well-founded per se. Instead, the IJ found that the reports showed that hundreds of thousands of people still practice Falun Gong in their homes and that punishment for Falun Gong practice depends on the facts of each case. Other than the presence of the police at his house, the IJ found that Qiu presented no other evidence that he would be harmed in China. The IJ questioned the validity of the summonses, and noted that even if credible, those summonses were not sufficient to establish a fear of future persecution. The IJ also credited no evidence that the Chinese were aware of his actions in front of their Chicago consulate. Finally, the IJ noted that there is a wide range of punishment for practitioners of Falun Gong (ranging from loss of employment to imprisonment) and that Qiu could not establish where his case falls along that spectrum. The Board adopted these findings, noting the little weight given to the summons and the unlikelihood that Qiu was identified by the

Chinese government as a protester in front of their con-sulate. The Board, then, found that the evidence sup-ported the IJ's decision that Qiu had not proven that he was eligible for asylum. *See* 8 U.S.C. § 1158(b)(1)(B) ("The burden of proof is on the applicant to establish that the applicant is a refugee . . . .").

To reverse the Board's decision, we must determine that the evidence compels the conclusion that Qiu has a well-founded fear of persecution. *See INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992). As a practical matter, we think it beyond doubt that Qiu is in for some type of trouble when he returns to China. If nothing else, the Chinese government need only search the Seventh Circuit web site's archived opinions to be alerted to his activities. But evidence describing the way the Chinese government treats repatriated, asylum-seeking Falun Gong adherents is not in the record. (The 2007 State Department Report on Religious Freedom in China does describe a Falun Gong adherent who was repatriated from Russia and has since been kidnapped; his wife believes it was at the hands of the Chinese government). The Board seemed to agree that Qiu was indeed in for some type of punishment in China, but found that Qiu could not prove how harsh it was going to be.

Uncontested in this matter are the propositions that a Falun Gong practitioner can qualify for asylum and that Qiu is a bona fide Falun Gong adherent. Also uncon-tested is the proposition that Qiu genuinely fears perse-cution in China. The issue for our consideration is only whether this fear is justified. So, to obtain a reversal, Qiu

needs to show that he has proven that a Falun Gong practitioner, like him, would be in for some trouble in China and that the trouble would be severe enough to rise to the level of persecution. *See Bhatt v. Reno*, 172 F.3d 978, 982 (7th Cir. 1999) ("[A petitioner] must show specific, detailed facts supporting the reasonableness of his fear that he will be singled out for persecution." (internal quotations and alterations omitted)). The burden is on him to do so. 8 U.S.C. § 1158(b)(1)(B). Because Qiu got out of China in time (which means he can't rely on previous persecution at the hands of the Chinese authorities to prove future persecution), and because he hasn't spoken to any of the other practitioners who were rounded up when he was (including the master and his friend who introduced him to Falun Gong), Qiu's only evidence appears to be the State Department reports entered into evidence below. If pertinent, these State Department reports can be sufficient to prove a well-founded fear of persecution. *See Tamas-Mercea v. Reno*, 222 F.3d 417, 423 (7th Cir. 2000).

The State Department reports, relied on by Qiu, reveal that in 1999, Falun Gong was officially banned by the Chinese government, and that as late as 2007, "Falun Gong practitioners continued to face arrest, detention, and imprisonment, and there were credible reports of deaths due to torture and abuse." 2007 State Department Report on Religious Freedom in China. "Practitioners who refuse to recant their beliefs are sometimes subjected to harsh treatment in prisons, reeducation through labor camps, and extra-judicial 'legal education' centers." *Id.* "Some foreign observers estimated that at least half

of the 250,000 officially recorded inmates in the country's reeducation-through-labor camps are Falun Gong adherents. . . . Hundreds of Falun Gong adherents were also incarcerated in legal education centers, a form of administrative detention, upon completion of their reeducation-through-labor sentences. . . . In March 2006 U.N. Special Rapporteur on Torture Manfred Nowak reported that Falun Gong practitioners accounted for 66 percent of victims of alleged torture while in government custody." *Id.*

The 2006 State Department Report on Human Rights in China catalogs several beatings, deaths, and disappearances of Falun Gong advocates (these people seem to be something more than your average practitioner) and it also notes that Falun Gong practitioners and their families are targeted for arbitrary arrest, detention, and harassment. The State Department also reports that Falun Gong practitioners are subject to a "crackdown." While "core leaders" of Falun Gong are singled out for harsher treatment, apparently most practitioners are forced into study sessions or sent directly to the reeducation-through-labor camps.

Had Qiu been more of an activist in China, we don't think there's any question that he established a well-founded fear of future persecution upon his return to China. But, the question is whether a Falun Gong practitioner in his situation can expect this same type of persecution. The IJ and the Board relied on the fact that Qiu practiced Falun Gong for only about three months; they found that this makes him a low-level

practitioner and therefore subject to lesser penalties. While we agree that the facts established that Qiu is a novice practitioner (or at least was when he left China), the evidence also shows that the police were at his door only three months after he started practicing. This establishes, at least, that police are interested in any Falun Gong practitioner, not merely the "core leaders." The evidence also establishes, both through the State Department reports and Qiu's personal experience, that the Chinese do not tolerate "private" Falun Gong practice. Qiu's private sessions with his group were reported to the police who acted accordingly. Falun Gong is illegal in China and the only way for Qiu to avoid punishment is to cease practicing Falun Gong or work even harder to avoid discovery.

Reading more closely into the State Department reports, it also looks like the Board made an error: the Board held that Qiu cannot establish that he, specifically, will be persecuted because most practitioners of Falun Gong were "punished administratively." That sounds like they were given a slap on the wrist; but when you look at the State Department Report on Human Rights Practices in China in 2006 (which the Board relied on), you see that the term "administrative" includes "administrative detention centers" which are "administered separately from the formal court system." Later in the report, we find that "[a]ctivists sentenced to administrative detention also reported they were strapped to beds or other devices for days at a time, beaten, forcibly injected or fed medications, and denied food and use of toilet facilities." Administrative detention facilities include

"reeducation-through-labor camps" and conditions there are described as "similar to those in prisons." Conditions in prison are described as "harsh and degrading." The report notes that "[a]dministrative detention was frequently used to intimidate political activists and prevent public demonstrations" and that the Chinese "government was reforming its administrative punishment system, but reforms seek to codify rather than abolish it." Activists can be sentenced to "three years in reeducation-through labor camps or other detention programs" without trial by administrative panels. The IJ found that Qiu faced punishment from "possible loss of employment to imprisonment" and that many Falun Gong practitioners who are released after detention are re-arrested. Administrative punishment, therefore, does not necessarily mean lenient punishment. To us, therefore, it seems that administrative punishment may be persecution and indeed, Qiu can expect to be administratively punished when he returns to China. The Board's minimization of administrative punishment must be more clearly explained, therefore, before we can defer to its determination that Qiu has no well-founded fear of persecution. *See Gomes v. Gonzales*, 473 F.3d 746, 757 (7th Cir. 2007) ("We cannot defer to findings of fact that the immigration judge has not made." (quotation omitted)).

The government's response is that it is incumbent on Qiu to prove the degree of harm he can expect when he returns to China. But all the evidence in the case shows that Qiu can never practice Falun Gong again if he goes back to China unless he's willing to be punished. *See*

*Ghebremedhin v. Ashcroft*, 385 F.3d 1116, 1120 (7th Cir.), *opinion modified on reh'g*, 392 F.3d 241 (7th Cir. 2004) (noting that the State Department reports established a "history of persecution" in petitioner's country and finding that "nothing in the record demonstrates that [the petitioner] would not face the same dangers should he be returned there"). At best, the State Department reports establish that there's a sort of progressive discipline structure for punishment of Falun Gong prisoners, but the discipline only appears to stop if the practitioner ceases to practice Falun Gong.

Asylum exists to protect people from having to return to a country and conceal their beliefs. *Iao v. Gonzales*, 400 F.3d 530, 532 (7th Cir. 2005); *Muhur v. Ashcroft*, 355 F.3d 958, 960-61 (7th Cir. 2004) (noting the "fatal flaw" in the IJ's opinion lies in the "assumption—a clear error of law—that one is not entitled to claim asylum on the basis of religious persecution if . . . one can escape the notice of the persecutors by concealing one's religion"). We addressed a similar issue in *Iao,* 400 F.3d at 531, where we remanded an IJ decision that was "unreasoned." There, the IJ made several factual errors and faulty assumptions that undercut his ultimate decision that a Falun Gong follower should be deported. As an aside, we noted: "The number of followers of Falun Gong in China is estimated to be in the tens of millions, all of them subject to persecution . . . . [Because] [a]nyone, we suppose, can get hold of a book of [Falun Gong] teachings, start doing the exercises, and truthfully declare himself or herself a bona fide adherent to Falun Gong[,] [t]he implications for potential Chinese immigration to the

United States may be significant. . . . But Congress has not authorized the immigration services to [control Chinese immigration] by denying asylum applications in unreasoned decisions." *Id.* at 533.

While the Board found that Qiu had failed to establish that he was subject to a well-founded fear of persecution on return to China because he could not identify the type of punishment he would be subject to, we find that the evidence established the opposite. The State Department reports and Qiu's own credited testimony established that he is a Falun Gong practitioner, that the practice of Falun Gong is outlawed in China, that the Chinese police know he practices Falun Gong, that China persecutes Falun Gong practitioners, and that the only way Qiu can avoid persecution is to cease the practice of Falun Gong or hope to evade discovery. Putting Qiu to such a choice runs contrary to the language and purpose of our asylum laws. Before finding Qiu ineligible for asylum, the Board must reconcile the dilemma facing Qiu, the level of persecution he would face in China's administrative system, and the asylum statute. Accordingly, we grant the petition for review and remand for reconsideration in light of our opinion.