NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued June 7, 2012
Decided August 8, 2012

*Before*

DANIEL A. MANION,  *Circuit Judge*

MICHAEL S. KANNE,  *Circuit Judge*

DAVID F. HAMILTON,  *Circuit Judge*

No. 11-3717

| | |
|---|---|
| CHANGHUI JIANG,<br>             *Petitioner*, | Petition for Review of an Order of<br>the Board of Immigration Appeals |
|     *v.* | No. A096-395-403 |
| ERIC H. HOLDER, JR., Attorney<br>General of the United States,<br>             *Respondent*. | |

### O R D E R

Petitioner Changhui Jiang was apprehended by the U.S. Department of Homeland Security when he attempted to enter the United States illegally. Although he conceded his removability, Jiang filed an application for asylum, withholding of removal, and protection under the Convention Against Torture. At his removal hearing, the Immigration Judge ("IJ") found his testimony incredible, and also found that he failed to submit any corroborating evidence. The IJ therefore ordered Jiang removed, and the Board of Immigration Appeals ("BIA") affirmed on appeal. Jiang then petitioned this court for review, and after doing so we DENY his petition.

## I.

Jiang is a 36-year-old Chinese citizen who attempted to enter the United States with a fraudulent passport in April 21, 2004, but was stopped by Department of Homeland Security officials in San Francisco. The Department of Homeland Security charged Jiang with falsely representing himself as a citizen of the United States under the Immigration and Nationality Act § 212(a)(6)(C)(ii), 8 U.S.C. § 1182(a)(6)(C)(ii), and set a removal hearing date for October 14, 2004. Before the hearing, Jiang conceded removability but he also noted that he intended to apply for asylum, withholding of removal, and protection under the United Nations Convention Against Torture. He completed this application on October 8, 2004.

Jiang attached a personal statement to his application in which he set forth the bases for his asylum and withholding-of-removal claims. Jiang stated that he feared persecution on his removal to China because of his violation of China's family-planning policy. Jiang's story begins in 1996 when he got married at the age of 20—below China's legal marriage age. For fear of retribution, he and his wife, Yan Qing Lin, did not register for an official marriage license. The next year, 1997, Lin gave birth to a daughter; however, because Jiang and Lin were illegally married and had a child without permission, Jiang believed that he faced a significant fine and possible detention. So he decided not to register his daughter as a member of his household.

Then, in 1999, Jiang claimed that he met a friend named Yun Sheng Jiang who purportedly worked for the local government and who promised to help Jiang get a marriage license, to register Jiang's daughter as a member of his household, and to obtain a second birth permit for another child. Having received this promise, Jiang and Lin decided to have another child, and on May 7, 2000, Lin gave birth to a son. From 1999 to 2000, Jiang "gave many gifts" to Yun Sheng in the hope of acquiring official recognition for his marriage and children. During this time, however, Jiang was apparently quite busy operating a fast food restaurant in his native city of Fuzhou City in China's Fujian Province; he therefore was not able to keep close tabs on Yun Sheng's progress. Then, in August 2000, Jiang's hopes were dashed when he received word that Yun Sheng had been arrested.

Jiang averred that, soon thereafter, on the night of August 23, 2000, government officials paid a visit to his restaurant. Jiang stated that the officials surrounded the restaurant and that he narrowly escaped detection by fleeing out the back door. He raced to his house, gathered his wife and children, and left immediately. Jiang claimed that the government then sealed off his restaurant, prohibiting further operation. After Jiang had

fled, he heard from his parents that local government officials had come to his home several times and told them that he and Lin would be sterilized for violating China's family-planning policy. Facing possible sterilization and a significant fine, Jiang and Lin split up, hiding separately in various places for the next several years. Eventually, in April 2004, Jiang was able to sneak out of the country and make his way to San Francisco where, as we mentioned above, he was detained by Department of Homeland Security officials.

Jiang also submitted a letter from Lin in support of his application. Lin corroborated the couple's illicit marriage and their two unregistered children. Additionally, she recounted details from the night of August 23, 2000, including Jiang's harried return from his restaurant, his instruction to her to flee, and their subsequent separation and extended time spent in hiding. Lin attested that she dropped the children off at Jiang's parents' house before going on the run. She claimed that she and Jiang "could not do anything but closed [sic] our restaurant" because the government continued to search for them. It was Lin's understanding that, if she or Jiang were caught, the government would force them to be sterilized.

As additional support, Jiang submitted a traditional marriage certificate from the governing committee of the village in which he and Lin were married; a sworn statement by a mid-wife who verified that Jiang's two children were born in 1997 and 2000; a document dated January 18, 2000, from the Finance Administration Bureau of Fujian Province entitled "Special Bill for Birth-Beyond-Planning Fee of Fujian Province," which cited Jiang and Lin for having an unsanctioned child in 1997, ordered them to pay a total fine of 24,300 Yuan Renminbi ("RMB") (approximately $3,800), and noted that 4,300 RMB had been paid; a payment receipt dated September 3, 2004, which stated that Lin had paid 9,000 RMB for her and Jiang's daughter's school enrollment fee; and U.S. State Department country reports for the years 2006 and 2007.

After a few change-of-venue motions that took him from San Francisco to New York and then to Chicago, Jiang finally appeared before an IJ on October 29, 2009 (in Chicago) to argue his case for asylum, withholding of removal, or protection under the Convention Against Torture. At the hearing, Jiang elaborated on the story he told in his personal statement. On direct examination, Jiang testified that, in 2000, he paid Yun Sheng (who was a frequent customer at Jiang's restaurant) a sum of money to secure a marriage license for Jiang and his wife. Jiang stated that he was afraid to go through official channels to obtain a marriage license because he already had a child he believed that the government might therefore force him to pay a fine. Jiang then confirmed that Yun Sheng was arrested in August 2000. Soon after Yun Sheng's arrest, Jiang testified that, on the night of August 23,

2000, "the government closed down my restaurant and took everything in the restaurant away."

Jiang avoided contact with government officials from then on, instead claiming that he learned through his parents that he was being targeted for having "severely violated the family planning policy." His parents also relayed to him that government officials sought to sterilize, exact a fine, and possibly imprison either Jiang or Lin. Jiang then confirmed that he and Lin remained at large for four years, hiding separately in various places, before Jiang absconded to the United States. Lin and the children remain in China.

On cross-examination, the government's counsel asked Jiang to explain the "Special Bill for Birth-Beyond-Planning Fee of Fujian Province." Jiang elaborated that he paid Yun Sheng 4,300 RMB for his assistance, and Yun Sheng provided this document as a receipt. The document showed that Jiang was fined a total of 24,300 RMB for having an out-of-wedlock child; therefore, Yun Sheng explained, Jiang still owed 20,000 RMB. When asked why he thought that any punishment other than payment of this fine would be imposed on him, Jiang held to his parents' contention that either he or his wife would be sterilized for violating China's family-planning policy.

The IJ then took a turn at pressing Jiang on the details of his story. When asked by the IJ to further explain the events of August 23, 2000, Jiang testified that, late in the evening after the restaurant had closed, he saw several people pull up in two vehicles and approach the building "with things in their hands." Jiang quickly ran out of the back door and went to his house. There, he found his wife, children, and parents. Jiang and his wife fled, leaving their children with his parents. The next day, Jiang's parents went to his restaurant and found that chairs, tables, and his business license had all been taken.

The IJ was incredulous about several aspects of Jiang's story. First, she wondered why Jiang had not submitted a statement from his parents—the only eyewitnesses to his claim that the government had gutted his restaurant. Second, the IJ cited what she perceived to be an inconsistency between Lin's letter and Jiang's testimony—namely, that Jiang asserted that the government had forced them to close the restaurant while Lin's letter indicated that they had closed it of their own accord. Third, the IJ pointed out that "a lot of this could have been resolved" if Jiang had simply gotten a marriage certificate after he came of age. Jiang replied that he feared both being fined and sterilized, but the IJ retorted that the U.S. State Department country reports on China stated that the government usually only levied fines against violators of the family-planning policy—there was nothing indicating that Jiang faced sterilization for his wrongdoing.

The IJ rendered a decision on the same day of Jiang's removal hearing. She found Jiang's testimony to be incredible, and also noted that Jiang had failed to corroborate the key elements of his story. Further, the IJ held that, even if Jiang had testified credibly, he failed to demonstrate the requisite level of persecution needed to satisfy his burden of proof for asylum. Having failed to prevail on his asylum claim, the IJ then summarily dismissed Jiang's claims for withholding of removal and protection under the Convention Against Torture, because those claims are subject to a more stringent standard. Accordingly, the IJ denied Jiang's application in its entirety and ordered him removed to China. Jiang appealed to the BIA, which affirmed the IJ's conclusion based on her adverse credibility determination (the BIA declined to address the IJ's alternate rationale which assumed Jiang's credibility). Jiang then filed this petition for review.

**II.**

Because the Board affirmed the IJ's decision and added a few statements of its own, we will review the IJ's decision as supplemented by the BIA. *Jonaitiene v. Holder*, 660 F.3d 267, 270 (7th Cir. 2011) (citation omitted). As noted above, the IJ's decision focused primarily on Jiang's asylum claim. To prevail on this claim, Jiang bore "the burden of proving his statutory eligibility for asylum by showing past persecution or a well-founded fear of future persecution." *Shymyhelskyy v. Gonzales*, 477 F.3d 474, 479 (7th Cir. 2007) (citation omitted). Importantly, the term "persecution" requires behavior that "'rise[s] above mere harassment.'" *Capric v. Ashcroft*, 355 F.3d 1075, 1084 (7th Cir. 2004) (quoting *Ciorba v. Ashcroft*, 323 F.3d 539, 545 (7th Cir. 2009)). "We have defined persecution to include 'detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, torture, behavior that threatens the same, and non-life-threatening behavior such as torture and economic deprivation if the resulting conditions are sufficiently severe.'" *Shan Zhu Qiu v. Holder*, 611 F.3d 403, 405 (7th Cir. 2010) (quoting *Capric*, 355 F.3d at 1084)).

Here, Jiang submitted his own testimony and other evidence in an attempt to establish that he was the subject of persecution—specifically, because of the confiscation of his restaurant, the threat of imprisonment and sterilization, and the fine levied against him for violating China's family-planning policy. But "[b]ecause direct authentication or verification of an alien's testimony and/or evidence is typically very difficult and often impossible, the IJ evaluates the credibility of the applicant's evidence." *Capric*, 355 F.3d at 1085. The IJ found Jiang to be incredible, thus concluding that Jiang could not prove the requisite persecution in support of his asylum claim. We therefore focus our review on the IJ's adverse-credibility determination.

Our review is quite deferential; we will uphold the IJ's adverse-credibility determination so long as it is "supported by 'specific, cogent reasons' that 'bear a legitimate nexus to the finding.'" *Id.* at 1086 (quoting *Ahmad v. I.N.S.*, 163 F.3d 457, 461 (7th Cir. 1999)). Moreover, we note that we "should not supersede an administrative agency's findings simply because an alternative finding could also be supported by substantial evidence." *Ahmad*, 163 F.3d at 461 (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)). Thus, we will "overturn a credibility finding only in 'extraordinary circumstances.'" *Huang v. Gonzales*, 453 F.3d 942, 945 (7th Cir. 2006) (quoting *Giday v. Gonzales*, 434 F.3d 543, 550 (7th Cir. 2006)). Because Jiang filed his application before the passage of the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231, our credibility analysis is not affected by that law. *See Diallo v. Gonzales*, 439 F.3d 764, 765 n.1 (7th Cir. 2006).

In conducting a credibility analysis, the IJ "assesses the applicant's claim only for internal consistency, detail, and plausibility, typically demonstrated by background evidence concerning general country conditions, if available." *Capric*, 355 F.3d at 1085 (citations omitted). When an IJ determines that an alien's claim is credible, "the testimony of the alien alone 'may be sufficient to sustain the burden of proof without corroboration.'" *Id.* at 1085-86 (quoting *In re S-M-J-*, 21 I. & N. Dec. 722, 724 (BIA 1997)). "However, if the IJ finds the testimony to be incredible, then a convincing explanation of the discrepancies or extrinsic—and credible—corroborating evidence is required." *Id.* at 1086 (citation omitted).

The IJ found, and the BIA affirmed, that Jiang's testimony regarding past persecution and his fear of future persecution was incredible, and that Jiang failed to provide either a convincing explanation or adequate corroborating evidence to support his asylum claim. Specifically, the IJ found (1) an unresolved, material inconsistency between Jiang's and Lin's testimonies about the events of August 23, 2000; (2) that China's country conditions as reported in the State Department country reports did not support Jiang's testimony; and (3) that Jiang failed to corroborate a key claim in his testimony with a letter from his parents. Jiang disputes all of these findings.

Under our pre-REAL ID Act precedents, for an IJ to find that an inconsistency in an applicant's evidence renders that applicant incredible, the inconsistency must "go to the heart of [Jiang's] claim." *Adekpe v. Gonzales*, 480 F.3d 525, 531 (7th Cir. 2007) (citations omitted). "Further, the contradiction or omission must be substantive, and not easily explained or superficial." *Id.* (citing *Giday*, 434 F.3d at 551-52). Here, the IJ found that Jiang's personal statement attached to his asylum application, as well as his testimony at the removal hearing, was materially inconsistent with Lin's letter in one significant respect. Jiang's statement and hearing testimony averred that, on August 23, 2000, government

officials surrounded his restaurant, confiscated his business license, tables, and chairs, and shut down his operation. Lin recounted the events of that evening as well, mentioning Jiang's panicked return to their house, his exclamation that, "I am being wanted by [the] government," and his instructions to flee immediately. But Lin said nothing about the government being responsible for closing the restaurant, noting only that she and Jiang "could not do anything but closed [sic] our restaurant." The IJ found that Lin's testimony "seems to indicate that the restaurant was not confiscated, but that it was willingly closed by [Jiang] and his wife." In the IJ's mind, this "significant contradiction" cast doubt on the credibility of Jiang's testimony.

The events of August 23, 2000, and the immediate aftermath of that night, are without question at the heart of Jiang's asylum claim. That night was the first time that the Chinese government allegedly pursued Jiang for violating the family-planning policy, and it marked the beginning of Jiang's and Lin's lengthy time period spent in hiding. And the issue of how the restaurant was closed—whether Jiang and Lin closed the restaurant of their own accord or whether the government shut them down—is a significant question that likewise goes to the heart of Jiang's asylum claim. Indeed, if it was the government that shut down Jiang's restaurant, this would confirm Jiang's contention that the government confiscated his property and would lend significant weight to his belief that the government considered his and Lin's violation of the family-planning policy to be serious enough to warrant imprisonment and possibly sterilization. Conversely, if the government did not force Jiang to shut down the restaurant, Jiang's claim that his property was confiscated would be undermined, and it would also indicate that the government did not take Jiang's violation of the family-planning policy quite as seriously as he describes.

As the IJ noted, Lin's letter did not state that the government shut down the restaurant; rather, the IJ interpreted Lin's comments as indicating that Jiang and Lin shut down the restaurant on their own. This was a serious discrepancy, in the IJ's opinion, because the person who was in the best position to confirm Jiang's contention that the government shut down his operation did not do so. So the IJ asked Jiang at the hearing about the perceived contradiction, and Jiang attempted to reconcile Lin's statement with his own: "I would say that what she means is that the restaurant was closed. If the government stopped looking for us, stopped giving us trouble, maybe we would go back and start the business again, but there's no way that we would restart our business." This response did not answer the fundamental aspect of the IJ's question—namely, *who* was responsible for closing the restaurant. Thus, Jiang did not answer the IJ's concern about a possible inconsistency between Lin's statement and Jiang's testimony. To be sure, we can certainly envision several responses that might plausibly reconcile Lin's statement with

Jiang's testimony, thus rendering the contradiction "easily explain[able] or superficial." *Adekpe*, 480 F.3d at 531. But it is not our responsibility to come up with those responses, and Jiang failed to do so when given the opportunity. Moreover, simply because we could reconcile the two statements does not mean that we may. Under our deferential standard of review, as long as the IJ's decision is supported by substantial evidence on the record, we must uphold her decision. *Ahmad*, 163 F.3d at 461. The IJ's construction of Jiang's and Lin's testimonies was plausible, and Jiang failed to assuage the IJ's concern by providing a sufficient explanation. The IJ's adverse-credibility determination was based in part on this discrepancy, which we believe is a "'specific, cogent reason[]' that 'bear[s] a legitimate nexus to the finding.'" *Capric*, 355 F.3d at 1086 (quoting *Ahmad*, 163 F.3d at 461). We may not disturb such a finding.

In accordance with our case law, the IJ also compared Jiang's testimony to China's general country conditions as reported in the State Department's country reports and again found an inconsistency. Jiang repeatedly maintained that, if caught by Chinese government officials, he would be imprisoned, fined, and sterilized. He submitted the State Department country reports for years 2006 and 2007 to support this contention.[1] But we agree with the IJ that these reports contradict Jiang's professed fear of imprisonment and sterilization. The 2006 report states that Chinese law mandates that couples who have an "unapproved child" pay a "social compensation fee." That report does note that such a penalty is often strict, "leaving some women little choice but to abort pregnancies." Yet it goes on to state that only women were reported to have undergone forced abortions or sterilization—and even then such practices were documented only in rural areas (defined as towns of under 200,000 persons). The report mentioned nothing about imprisonment. And because Jiang is not a woman and his hometown of Fuzhou City had a reported population of more than 6,000,000 persons in the year 2000, *see* http://en.wikipedia.org/wiki/Fuzhou (citing the Fuzhou Municipal Statistic Bureau), the forced-sterilization report does not apply to him.[2]

---

[1] In his appellant's brief, Jiang also cites to the 2008 State Department country report, but because it is not in the record we will not consider it.

[2] We pause briefly to note that evidence of such heinous procedures as forced sterilization and abortion, although lacking in this case, would most certainly rise to the level of persecution and thus could form the basis for an asylum claim. *See Qiu*, 611 F.3d at 405.

The 2007 country report is even more contrary to Jiang's contention of impending sterilization and imprisonment. The report notes that Chinese law provides only that couples who have an unauthorized child pay a "social compensation fee," and further reports that, in Fujian Province (Jiang's native province), U.S. "Consulate General officers have found that many violators of the one-child policy paid fines but found no evidence of forced abortion or property confiscation." Moreover, the official Chinese policy states that "couples unable to pay the fee immediately may be allowed to pay in installments," but "parents cannot be sterilized if they are unable or refuse to pay the fee." The country report does note that some asylum applicants from Fujian complained that, in mid-2004, parents who had an unauthorized child were required to pay a security deposit to ensure future compliance with the family-planning policy. Those applicants stated that they were threatened with arrest if they did not post a deposit. These contentions could not be confirmed, and a posting on the city website of Quanzhou, Fujian, banned the practice of requiring security deposits for unauthorized children.

These reports cut against Jiang's testimony that he is subject to sterilization and imprisonment, and they indicate that fines imposed on family-planning violators are not unduly harsh. Moreover, the reports suggest that the Chinese government does not confiscate the property of family-planning policy offenders which significantly undermines Jiang's claim that his restaurant was shut down by government officials. Given these country conditions, all of which run counter to Jiang's own testimony, the IJ did not err in finding Jiang to be incredible.

As noted above, when an alien is found to be incredible, it is incumbent on him to provide "a convincing explanation of the discrepancies or extrinsic—and credible—corroborating evidence." *Capric*, 355 F.3d at 1086 (citation omitted). We have already detailed Jiang's inability to provide a convincing explanation of the discrepancies in his evidence; likewise, he was unable to provide credible extrinsic evidence to support his testimony. As the IJ noted, the most obvious form of such evidence would have been a statement from Jiang's parents. After all, they were the ones who told him that his restaurant had been gutted and that government officials were out to imprison and sterilize him. What is more, Jiang's case went through five years of procedural machinations before he finally appeared at a removal hearing. This left Jiang plenty of time to obtain a statement from his parents and, as the BIA noted, there is no indication that such a statement could not have been reasonably obtained. Indeed, when asked why he did not obtain a statement from his parents, Jiang simply replied, "I didn't think of that." The IJ and BIA did not err in finding that he should have.

Jiang also has not provided credible corroborating evidence that the fine that has been levied against him for violating the family-planning policy rises to the level of persecution. In support of his claim, Jiang supplied a "Special Bill for Birth-Beyond-Planning Fee of Fujian Province," which ordered Jiang and Lin to pay a total fine of 24,300 RMB, and a payment receipt dated September 3, 2004, which stated that Lin had paid 9,000 RMB for her and Jiang's daughter's school enrollment fee. The bill ordering Jiang to pay 24,300 RMB (of which he has already paid 4,300 RMB) certainly demonstrates an economic sanction, which can independently qualify as "persecution" if it is "extreme." *Id.* at 1092. No doubt that the remaining 20,000 RMB that Jiang owed would work hardship on him and his family, but hardship alone does not equal persecution. *See id.* at 1093. Indeed, according to the State Department country reports, the Chinese government allows such fines to be paid in installments—an accommodation that eases the financial burden. What is more, the receipt for Jiang's daughter's school enrollment shows that he had the ability to make periodic installment payments. The IJ did not err in finding that Jiang failed to demonstrate persecution in the form of extreme economic harm.

### III.

The IJ, as affirmed by the BIA, articulated specific, cogent reasons that bore a legitimate nexus to her finding that Jiang's testimony was incredible. Jiang was unable to resolve a discrepancy between his testimony and Lin's letter, and he was unable to reconcile his allegations of persecution with the State Department country reports in the record. Moreover, Jiang failed to supply credible corroborating evidence of his claims. Accordingly, the IJ did not err in finding that Jiang failed to demonstrate the requisite persecution needed to qualify for asylum. And because Jiang cannot meet the standard for his asylum claim, he necessarily cannot satisfy the more stringent standards for withholding of removal and protection under the Convention Against Torture. *Kholyavskiy v. Mukasey*, 540 F.3d 555, 568 n.14 (7th Cir. 2008). The petition for review is DENIED.